[L. A. No. 28626.   In  Bank.   Sept. 22, 1967.]

L. C. FAUS, Plaintiff and Respondent, v. CITY OF LOS ANGELES, Defendant and Appellant.

Roger Arnebergh, City Attorney, Bourke Jones and Weldon L. Weber, Assistant City Attorneys, Brian Crahan and Norman L. Roberts, Deputy City Attorneys, for Defendant and Appellant.

Harry S. Fenton, R. B. Pegram, Richard L. Franck, Charles E. Spencer, Jr., and Robert W. Vidor as Amici Curiae on behalf of Defendant and Appellant.

Demetriou & Del Guercio and Richard A. Del Guercio for Plaintiff and Respondent.

TOBRINER, J.—The issue in this case devolves from the fact that in 1955 public motor coach service was substituted for public electric railway service over rights of way in the Los Angeles area that were granted for an electric railway. Plaintiff urges that the conversion of the rights of way conflicts with the terms of the instruments of their creation, causing a destruction of the easements to which the parcels were subject. For the reasons set forth in this opinion we have concluded that the present use of the subject parcels sufficiently complies with the purposes of the grantors to permit survival of the easements. We also hold that plaintiff cannot support a claim for compensation for the city's use of longitudinal portions of the rights of way that were paved prior to the 1955 change from electric to motor vehicular transportation. Finally, we find that no portions of these easements have been extinguished by abandonment.

The seven grants in the present case all date from the period 1901-1911 and involve parcels of land lying in the then

outskirts of the expanding Los Angeles area. Although the seven deeds differ in many respects, they typically conveyed rights of way for the construction and operation of a passenger railway running into central Los Angeles.[1] Within the time limits set forth in the deeds the grantee railroads constructed the specified facilities and commenced to render the required services. Thereafter, the original grantors subdivided and sold all of their lands abutting the rights of way except strips along the edges of the rights of way, which they dedicated for public streets.

The grantee railroads and their various successors (ultimately the Los Angeles Transit Lines) maintained streetcar service over the subject parcels until May 1955. At various times between 1924 and 1948 the City of Los Angeles, acting pursuant to deeds from the railroads, paved for street purposes certain portions of the rights of way lying parallel to the tracks. Neither the original grantors nor their heirs urged any objection to this use. Indeed the heirs of the grantors of the parcels involved in the second and third causes of action actually petitioned the city to pave the longitudinal portions of the rights of way.

Pursuant to an order of the California Public Utilities Commission authorizing the cessation of such streetcar services on condition that the Los Angeles Transit Lines provide substitute motor coach service along the same routes,[2] the company, in May 1955, terminated the electric railway services. The order also required the Los Angeles Transit Lines to refrain from alienating the rights of way for 180 days so that the city might acquire this property. During that period the city took the land by condemnation; the heirs of the original grantors were not named in that action. The city later widened the adjoining streets, incorporating into them all of the land which had formerly borne the tracks.

Plaintiff Faus has located the heirs of the original grantors and has obtained from them an assignment of all interest

---

[1] Both parties take the position that the interests created by the deeds were easements rather than possessory estates.

[2] Prior to the order of the Public Utilities Commission the Los Angeles Transit Lines operated rail service over Crenshaw Boulevard, Leimert Boulevard, and Santa Barbara Avenue pursuant to the deeds giving rise to the first, second, and third causes of action, and also over Vermont Avenue pursuant to the deeds giving rise to the remaining causes of action. The Public Utilities Commission ordered the institution of services on Motor Coach Lines 5 and 6 over the same streets.

which they might have in the subject parcels. Plaintiff commenced the present action in May 1960, urging that the city's use of the land violated the conditions contained in the original deeds and thus entitles him to an award for the taking of the property. The trial court accepted this contention and entered judgment in plaintiff's favor.

Defendant City of Los Angeles urges that the uses to which the subject parcels are now devoted cannot be deemed inconsistent with the terms of the original grants. It acknowledges that the grantors specified that the property was to be used "for the purposes of an electric railway" or "for an electric railway"[3] and that several of the deeds explicitly state that cessation of railway service for six months shall cause reversion of the land.[4] But defendant contends that the deeds must be construed with reference to the grantor's underlying purpose. (*Wattson* v. *Eldridge* (1929) 207 Cal. 314, 321 [278 P. 236]; *Abbot Kinney Co.* v. *City of Los Angeles* (1963) 223 Cal.App.2d 668, 675-676 [36 Cal.App.2d 113].) That purpose, the city asserts, was to make sure that the inhabitants of the properties which the grantors wished to subdivide would enjoy the best means of interurban public transport which was technologically feasible. The very language of the deeds

---

[3]The exhibits appended to plaintiff's complaint for declaratory relief set forth the relevant deeds. The deed marked Exhibit A provides for conveyance of "a right-of-way sixty feet in width, for the purpose of an electric railway on, along and over the following described real estate . . . "; the deed marked Exhibit B provides for conveyance of "a right of way Sixty feet in width, for the purpose of an Electric Railway on, along and over the following described real estate . . . "; the deed marked Exhibit D provides for conveyance of "a right of way for an electric road over a strip of land situate in the County of Los Angeles, State of California, and described as follows . . . "; the deed marked Exhibit E provides for conveyance of "[a] strip of land for right of way for an electric railway situate in the County of Los Angeles, State of California, and particularly described as follows . . . "; the deed marked Exhibit F provides for conveyance of "a perpetual right-of-way for the construction, maintenance and operation of a railroad to be operated by electricity or some motive power, other than steam . . . "; the deed marked Exhibit G provides for conveyance of "a right of way Sixty feet in width, for the purpose of an electric railway on, along, and over the following described real estate, situate in the County of Los Angeles, State of California . . . "; the deed marked Exhibit H provides for conveyance of "a right of way sixty feet in width, for the purposes of a double track electric railway on, along and over the following described real estate, situate in the County of Los Angeles, State of California . . . ."

[4]For instance, the deed set forth as Exhibit A provides: "If said electric railway is not in operation within the time set down above, or if, at any time hereafter, when said railway has been completed, the same shall cease to be operated for a period of six months, constituting a practical abandonment of the same, then this deed shall be null and void . . . ."

discloses the concern of the grantors that the vehicles of transportation stop at available places for boarding.[5]

Fifty years of technological change, embracing developments in internal combustion vehicles and techniques of highway construction, have undoubtedly produced a situation in which motor buses have won public preference because of their greater flexibility of route and schedule. Plaintiff acknowledges "the economic and functional obsolescence of the electric street railways." Plaintiff has not suggested that the bus service provided over the roads which now occupy the former railroad right of way affords a less satisfactory means of public transport for the adjacent landowners than that previously supplied by the streetcar network. Moreover, the order of the Public Utilities Commission, coming as it does from the agency authorized to determine and declare the public interest in matters of transportation, affords persuasive evidence that the bus service now provided over the former railroad routes constitutes an adequate substitute.

■ Because its operation must necessarily be prospective, we make the "assumption . . . in the case of an easement created by conveyance that the conveyance, having by its nature a prospective operation, should be assumed to have been intended to accommodate future needs." (2 American Law of Property, § 8.69, p. 281.) Our courts have been receptive to the contention that changed economic and technological conditions require reevaluation of restrictions placed upon the use of real property and may render legally inoperative certain changes in use which would otherwise require a reversion. (See *City of Santa Monica* v. *Jones* (1951) 104 Cal.App. 2d 463, 471 [232 P.2d 55]; cf. *People* v. *City of Los Angeles* (1960) 179 Cal.App.2d 558, 572 [4 Cal.Rptr. 531]; see also 156 A.L.R. 1050.)

As early as 1894, this court was prepared to rule, contrary to the then prevailing authorities, that land subject to an easement for street purposes could be used for a passenger or freight railway without thereby surcharging the easement. (*Montgomery* v. *Santa Ana etc. Co.* (1894) 104 Cal. 186 [37

---

[5]For instance, the deeds set forth as Exhibits A, B, G, and H provide that the railway "shall stop all 'local' or 'suburban' trains for passengers desiring to get on or off the cars, but no stops shall be made by through 'limited', 'express', or 'special' trains." The deed set forth as Exhibit D provides that the railway furnish not less than eight "local" services each way per day over the route between the hours of 6 a.m. and 10 p.m., in addition to providing for the stopping of local or suburban trains as set forth in the deeds marked Exhibits A and B.

P. 786, 43 Am.St.Rep. 89, 25 L.R.A. 654].) ''The world moves,'' we noted. ''The trend of judicial opinion, except where overshadowed and incrusted with *stare decisis,* is to a broader and more comprehensive view of the rights of the public in and to the streets and highways of [a] city . . . and, while carefully conserving the rights of individuals to their property, the courts have not hesitated to declare the shadowy title which the owner of the fee holds to the land in a public street or highway, during the duration of the easement of the public therein, as being subject to all the varied wants of the public and essential to its health, enjoyment and progress.'' (104 Cal. at p. 192.)

Thus, in *Abbot Kinney Co.* v. *City of Los Angeles, supra,* 223 Cal.App.2d 668, then Presiding Justice Burke ruled that a conveyance of land for use ''as a pleasure park or beach,'' which expressly provided that use of the premises for ''buildings of any kind or character'' or for ''teaming'' would cause a reversion, was nevertheless consistent with the paving of part of the property as a parking lot. In reaching this conclusion the court placed primary stress upon the changes in the prevailing mode of transportation which had occurred since the original dedication of the park. The court noted that at the time of its creation the park was served by an electric railway but that the railway had been abandoned when ''the automobile became almost the exclusive means of public transport.'' (223 Cal.App.2d at p. 671.) Accordingly, the court concluded that realization of the ''primary purpose and intent'' of the grantors which was ''to have said beach used by and open to the public'' necessarily required that the concept of ''public beach'' be expanded to include parking facilities. ''Changing conditions, in customs, usages and improvements,'' the court declared, ''must be deemed to have been contemplated by the grantor.'' (223 Cal.App.2d at p. 675.)

Similarly, in *Griffith* v. *City of Los Angeles* (1959) 175 Cal.App.2d 331 [346 P.2d 49], the court held that a grant of land to be used ''exclusively as a public park and pleasure ground'' was consistent with the use of one of the canyons in the park as a rubbish dump which, after being filled, would provide a level recreation area. The court pointed out that ''a dedication must be understood and construed with reference to its primary object and purpose. Nothing is improper which conduces to that object. The real question is whether the use in a particular case, and for a designated purpose, is consis-

tent or inconsistent with such primary object." (*Griffith* v. *City of Los Angeles* (1959) 175 Cal.App.2d 331, 337 [346 P.2d 49].) The court held that, "The dedicator is presumed to have intended the property to be used by the public in such way as will be most convenient and comfortable, and according to not only the proprieties and uses known at the time of the dedication, but as to those justified by lapse of time and change of conditions." (175 Cal.App.2d at p. 337.)

Most closely in point is *Wattson* v. *Eldridge, supra,* 207 Cal. 314. In that case, "In the year 1905 the Abbot Kinney Company, a corporation, conceived the idea of creating a city to be known as 'Venice of America,' having a system of waterways and canals resembling those of the old world city." (P. 317.) Accordingly, the company constructed intercommunicating canals converging into a lagoon, connected with the adjacent ocean. Thereafter the company transferred the canal areas to the City of Venice by an instrument which provided that " 'the premises herein conveyed shall be used . . . solely and only for permanent waterways, and canals. free to the public forever.' " (Pp. 317-318.)

Several years later, this court passed upon the issue whether the deed encompassed a substitute use of the area when the city proposed to close the canals and fill them in for utilization as streets.

In upholding that undertaking this court noted that, " [A] dedication must be understood and construed with reference to its primary object and purpose. . . . While the several intercommunicating canals . . .were used as well for recreaton purposes, they must of necessity, and because of the peculiar plan and construction of said city, be held to have been intended by the builder of that city to serve primarily as highways over which persons resident therein and the public generally might pass." (207 Cal. at p. 320.) "With changing conditions of travel and use," the court concluded, "a city has the right to adapt and appropriate its highways from time to time to such uses as in its judgment would be most conducive to the public good . . . ." (207 Cal. at p. 321.) The court finally pointed out that although the parties may not have "actually contemplated" the conversion of the canals to streets, "it may properly be said to have been within the legal contemplation of all that they were to be used for all purposes by which the object of their creation—as public highways or thoroughfares—could be promoted." (*Wattson* v. *Eldridge, supra,* 207 Cal. 314, 321.)

▇▇▇ The substitution in the instant case is less extensive than that in *Wattson*. There the obvious objectives of the original provision for the use of the areas as canals were multiple: recreational, including boating and swimming; residential, by inducement to build unusual and appealing houses fronting the canals; and, finally, transportational. The substitution of paved highways eliminated the first two objectives. In the present case, no such liquidation of primary objectives has occurred; here, indeed, the sole and exclusive purpose has merely been to up-date the transportation system so that a modern vehicular means of transport may be utilized in place of an outmoded one.

Justice Burke's observation as to the significance of the *Wattson* ruling applies with considerable force to the instant case. In comparing *Wattson* to the issue of the conversion of the beach land to the parking lot that arose in *Abbot Kinney Co.* v. *City of Los Angeles, supra,* 223 Cal.App.2d 668, he stated that the *Wattson* "action involved a more drastic change from the specific purpose indicated in the grant than that involved in the present action; yet, because of the great change in conditions that had occurred between the time of the grant and the conversion of canals to public streets, the court was constrained to interpret the grant to be permissive of an adaptation that would be a practical fulfillment of the expressed purpose." (223 Cal.App.2d at p. 676.)

▇▇▇ The right to substitute modern mechanisms of transportation for old ones under the deeds in the present case must be viewed in the light of its public effect. We deal here with an improvement of public transportation by a public utility for the benefit of the public. We note that in the cases cited, such as *Wattson, Kinney,* and *Griffith,* the courts dealt with matters that affected the public interest. In each of those cases the courts sanctioned a more efficient and publicly beneficial means to achieve the deeds' underlying and main purpose. We fail to see why we should carve an exception in the instant case and hold that the deeds fix forever the means of public transport in the straitjacket of an outmoded method.[6]

---

[6]Cases in jurisdictions other than California lend support to the proposition that the conversion of a method of transportation from railroad to bus or trackless trolley does not constitute a destruction or abandonment of an easement for railway purposes. In *Anderson* v. *Knoxville Power & Light Co.* (1933) 16 Tenn.App. 259, [64 S.W.2d 204], plaintiffs' predecessor had conveyed a right of way to defendant streetcar company "so long as the same is used for railway purposes, otherwise to revert to the grantor, his heirs or assigns." Some years later defendant removed the rails and began to operate trackless trolley service.

In answer to the proposition that the city's present use of the rights of way does not offend the deeds, plaintiff, first, relies upon three cases which, he claims, hold otherwise, and, second, asserts that the trial court's finding of fact that the easements had been abandoned binds this appellate court.

The three cases upon which plaintiff relies (*Faus* v. *Pacific Elec. Ry. Co.* (1960) 187 Cal.App.2d 563 [9 Cal.Rptr. 697]; *Faus* v. *Pacific Electric Ry Co.* (1956) 146 Cal.App.2d 370, 376 [303 P.2d 814]; *Tamalpais etc. Co.* v. *Northwestern Pac. R.R. Co.* (1946) 73 Cal.App.2d 917, 925 [167 P.2d 825]) held that the maintenance of bus service in place of abandoned railroad rights of way would not prevent their reversion. In those cases, however, the bus routes did not, as in the instant case, lie upon the *same* rights of way. Although in the *Faus* cases they paralleled the old routes, the buses ran upon *other* and *different* rights of way.[7] In the instant case the

Plaintiffs unsuccessfully sought to enjoin these operations. The court noted, "It is true that a trackless trolley does not run upon steel rails or in fact upon any kind of rails, but it serves all of the purposes of an ordinary street car which does run upon steel rails. It is more convenient to the public, in that it can pull up to the curbing so that passengers may board or alight without crossing a part of the street. . . . The main object of any street railway line or street car line is, of course, to carry passengers, and this is the main object and purpose of the trackless trolley involved in this cause." (16 Tenn.App. at p. 263.) On the basis of these and other facts the court held that "by changing to the trackless trolley the defendant, in law, did not abandon its right of way or cease to use it for railway purposes . . . ." (*Ibid.*)

In *Kansas Electric Power Co.* v. *Walker* (1935) 142 Kan. 808 [51 P.2d 1002, 102 A.L.R. 387], defendants had given plaintiff a warranty deed to a strip of land, and in partial consideration plaintiff had promised to construct "its line of street railway" in accordance with certain specifications. Twenty years later plaintiff removed the railway ties and tracks and used the strip as a road for gasoline-driven motor buses. Plaintiffs brought the action to enjoin defendants from constructing fences across the strip. In framing the question before it, the court stated: "The abandonment claimed is not by disuse, as in many of the cases cited, because the plaintiff is still using this strip or right of way and for the same purpose of transportation of passengers, but the use of it is claimed to be such a radical departure from the original intention and purpose for which the right of way was obtained as to amount to an abandonment." (142 Kan. at p. 811.) After consideration of the relevant cases, the court upheld the conclusion of the trial court that "'the change in a method of transportation of passengers by the plaintiff does not constitute an abandonment of the plaintiff's right of way.'" (142 Kan. at p. 810; but see *Connolly* v. *Des Moines & Central Iowa Ry. Co.* (1955) 246 Iowa 874, 880 [68 N.W.2d 320, 322].)

[7] In *Faus* v. *Pacific Elec. Ry. Co., supra,* 187 Cal.App.2d 563, the court points out that "passenger service by rail was discontinued and the railway substituted therefor on highways *adjoining* the right of way a bus system of transportation, which has been continued in operation." (Italics added.) (P. 565.)

In *Faus* v. *Pacific Electric Ry. Co., supra,* 146 Cal.App.2d 370, the

roads which bear the buses physically and actually lie atop and on the former rights of way; defendant continues to satisfy the very purposes of the grantors by providing the desired public transportation over the identical routes originally contemplated. The gravity of this difference in routes led Justice Peters in the *Tamalpais* case to declare: "[I]t certainly is not substantial performance of the deed provisions to abandon the railroad and to substitute service by a different corporation that has no interest in the lands over a *different right-of-way*." (Italics added.) (73 Cal.App.2d at p. 925.)

Although plaintiff replies that in the present case only the *inner* lanes of the road lie atop the rights of way and that the buses do not often travel in these lanes and do not use the area for loading passengers, we do not believe that infrequency of use will work the lapse of the easement. pursuant to its terms, so long as proper substituted use continues. In the *Tamalpais* case itself the court ultimately concluded as a matter of law that the maintenance of desultory freight service would prevent the lapse of an easement which required "the maintenance and operation of a railroad" on pain of reversion, even though the court acknowledged that, "the intermittent freight service now operating may not have been what the original parties had in mind. . . ." (73 Cal.App.2d 917, 925.)

Moreover, in none of the above cases did the court actually address itself to the question whether the bus service might constitute substantial compliance with the deeds; the courts ruled that the question framed purely a factual issue. The issue cannot properly be deemed one of fact when, as in the present case, its resolution basically depends upon the construction of the documents which created the easements. Subsequent to the decisions in the cases cited by plaintiff we held that, "It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) When there is no extrinsic evidence or "no conflict" in such extrinsic evidence as has been introduced, "we must make an independent determination of the meaning" of a legal instrument. (62 Cal.2d at p. 866.)

---

opinion states, "The contention is that by reason of a change of economic conditions and substitution of motor coach service over *parallel routes*, defendant was excused from further compliance with the terms of the conditions subsequent . . . ." (Italics added.) (P. 376.)

In the present case the evidence discloses no conflict regarding the use now being made of the subject parcels. Plaintiff poses only the question whether that use sufficiently complies with the terms of the governing instruments to permit survival of the easements. That inquiry solely presents a question of law; this court must reach its own resolution of that question. ▇▇▇ We have concluded that the grantors primarily intended to provide public transportation service across their land.[8] Regular bus transportation along the roads which now encompass the rights of way effectuates this purpose of public service and permits survival of the easements.

▇▇▇ We now turn to our analysis of the status of the longitudinal portions of the rights of way that *were paved* prior to the 1955 cessation of rail service. Plaintiff contends that so long as the rail transportation continued the city could not justify the conversion of portions of the rights of way into streets. We therefore consider whether plaintiff can support a claim for compensation for the city's use of these longitudinal portions.

As we shall point out, we need not determine whether the pre-1955 pavings caused the partial destruction of the easements to which the lands were subject. Even if we were to conclude that such destruction took place, that holding would not support plaintiff's recovery. Ample time elapsed between those pavings, ending in 1948, and the commencement of the present action for the city to have acquired prescriptive easements in place of any portion of the earlier easements which had been extinguished by the pre-1955 pavings.

Plaintiff urges that the statute of limitations applicable to the acquisition of prescriptive rights in the longitudinal portions did not begin to run at the time the portions were paved since the city's use was permissive rather than hostile; he notes that the railroad gave its permission for the paving of the longitudinal strips. This argument, however, begs the question, which is whether the railroad *could* give effective permission. If the grants to the railroad did not include the right to pave the longitudinal portions as streets then the

---

[8]The fact that the city, rather than the railroad, now has title to the rights of way does not affect the public purpose involved in the grants. The original grants were made with the intent of benefiting the public by assuring transportation service (cf. *People* v. *Ocean Shore Railroad, Inc.* (1948) 32 Cal.2d 406, 421 [196 P.2d 570, 6 A.L.R.2d 1179]), and the city, along with the transit authority, has now assumed the responsibility of carrying out that purpose. (See 95 A.L.R.2d 468, 498-499.)

railroad could no more give the city permission to do so, and thereby effectively bar the grantors from enforcing an immediate right of action, than could any other stranger to the title.[9]

If, under the limitation of the deeds, the railroad could not authorize the pre-1955 pavings, those pavings were an open, hostile and adverse use giving rise prior to 1960 to prescriptive easements on the part of the city. ■ The holder of a limited easement may broaden its scope by maintaining an open, hostile and nonconforming use for the prescriptive period. (*Mendelson* v. *McCabe* (1904) 144 Cal. 230, 232 [77 P. 915, 103 Am.St.Rep. 78]; *Allen* v. *San Jose Land & W. Co.* (1891) 92 Cal. 138, 142 [28 P. 215, 15 L.R.A. 93]; *Redemeyer* v. *Carroll* (1937) 21 Cal.App.2d 217, 219 [68 P.2d 739]; 110 A.L.R. 915; cf. *City of Santa Monica* v. *Jones, supra,* 104 Cal.App.2d 463, 476.) A *fortiori* a third party can acquire prescriptive rights in land subject to a limited easement by maintaining a nonconforming use for the necessary period.[10]

■ If, on the other hand, the original easements *did* embrace the right to pave the longitudinal portions, as a proper incident to the maintenance and operation of the railroads, then the pre-1955 pavings could not have produced a partial forfeiture of those easements. Accordingly we have found it unnecessary to determine whether the pre-1955 pavings were inconsistent with the terms of the original grants since neither an affirmative nor negative resolution of that issue would entitle plaintiff to recover compensation for the taking of the longitudinal portions.

■ Finally, we cannot accept plaintiff's argument that

[9]Plaintiff places much reliance upon cases which hold that during the lifetime of a life tenant, the statute of limitations does not run against the remainderman as to non-wasteful uses of the property made by a third party pursuant to permission to transport from the life tenant. (See, e.g., *Thompson* v. *Pacific Electric Ry. Co.* (1928) 203 Cal. 578 [265 P. 220].) Those cases are clearly inapplicable here since a life tenant, unlike the holder of an easement, enjoys a right to the use of the property which is restricted only by the rules against waste. (See Civ. Code, § 818.)

[10]Thus in *Redemeyer* v. *Carroll, supra,* 21 Cal.App.2d 217, the court held that Redemeyer, a stranger to the title, who had made unlimited use of a road which was subject to a limited easement in another person, had, by his use of the property, acquired an unlimited prescriptive easement. The court predicated this conclusion upon the fact that, "the original use granted to [the holder of the limited easement] was for the particular purpose of transporting lumber and tanbark, while the use of the road by plaintiff was of an entirely different nature, and was of itself notice to defendants of a claim to an independent right in plaintiff." (21 Cal.App.2d at pp. 219-220; cf. *Goodman* v. *Southern Pac. Co.* (1956) 143 Cal.App.2d 424, 429 [299 P.2d 321].)

we must affirm the judgment because the trial court found that the easements had been extinguished by abandonment. He notes the undisputed evidence that in 1955 the rail service ceased and the tracks were thereafter removed; these facts, he argues, sufficiently demonstrate the railroad's nonuse and intent to abandon the right of way. (See *Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co.* (1962) 206 Cal.App.2d 421, 436-438 [23 Cal.Rptr. 881]; *Ocean Shore R.R. Co.* v. *Doelger* (1960) 179 Cal.App.2d 222, 231-232, 235-236 [3 Cal. Rptr. 706].) Citing *People* v. *Ocean Shore Railroad, Inc.*, *supra*, 32 Cal.2d 406, 417, for the proposition that "whether or not there has been . . . an abandonment is ordinarily a question of fact," he contends that we must defer to the judgment of the trial court.

We cannot characterize this question as one of fact.[11] In this case the issues of abandonment and of consistent use coalesce; the Restatement of Property points out that "The intention required in the abandonment of an easement is the intention not to make in the future the uses authorized by it. The benefit of an easement lies in the privilege of use of the land subject to it. There is no abandonment unless there is a giving up of that use." (Rest., Property, § 504, com. c.) We have held as a matter of law that the rights of way are presently being used in a manner consistent with the original grants.

Accordingly, we must determine whether any interruption *in the past* in that use was sufficient to extinguish the easement as to all or part of the property. ▮ Since the easements were created by grant, abandonment could not result from mere nonuser; the holder must also manifest an intent to forswear all future conforming uses of the easement. (*People* v. *Ocean Shore Railroad, Inc., supra,* 32 Cal.2d 406, 419; *Buechner* v. *Jonas* (1964) 228 Cal.App.2d 127, 132 [39 Cal. Rptr. 298].) ▮ We consider this issue as it relates to the longitudinal portions of the rights of way that were paved prior to the cessation of rail service and as it pertains to the inner portions of the rights of way.

---

[11]Plaintiff relies heavily upon *Rosecrans* v. *Pacific Elec. Ry. Co.* (1943) 21 Cal.2d 602 [134 P.2d 245]. In that case as a condition of the grant of a right of way the railroad was required to establish and maintain daily passenger service. We held that the cessation of the passenger service after 32 years would cause forfeiture of the right of way because the grantor intended that the right should endure only so long as the railroad continued the desired service. In the instant case, however, defendant is *continuing* the service desired by the grantors.

With respect to the longitudinal portions paved prior to the cessation of rail service, no abandonment could have occurred since bus service, a use which we have held to be within the terms of the original grants, commenced over and upon these portions at the time that rail service ceased.

■ [See fn. 12] As for the inner portions,[12] the removal of the tracks after the cessation of rail service might have indicated an intention to abandon the easements over those portions (see *Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co., supra,* 206 Cal.App.2d 421, 438). ■ In this case, however, prior to the removal of the tracks defendant had condemned the property for public street purposes and otherwise indicated its intention to pave those portions as soon as reasonably practicable and to devote them to a use which, as we have held, conformed to the terms of the original grants. Under these circumstances we conclude that no abandonment of the easement as to any or all of the subject property could have taken place.

In the light of our resolution of the foregoing issues we have found it unnecessary to consider the additional defenses which the city has raised to plaintiff's claims.

The judgment is reversed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied October 25, 1967.

---

[12]If we assume that the city's pre-1955 use of the longitudinal portions did not cause the destruction *pro tanto* of the rights of way, an additional reason supports our holding that the unpaved portions of the rights of way were not abandoned. The owner need not constantly devote the entire right of way to the permitted uses, so long as he does not indulge in inconsistent uses. (See 17 Cal.Jur.2d, Easements, § 23; *Tamalpais etc. Co.* v. *Northwestern Pac. R.R. Co., supra,* 73 Cal.App.2d 917, 930.) In the present case the city made no inconsistent use of the unpaved fragments following the cessation of rail service and eventually incorporated these areas into the existing street system.