Robert A. VIEUX, Winifred J. Vieux, Donald J. Vieux, Trustee of the Estate of Carl Zwissig, Ralph F. Pombo, Gordon Griffith, Marianne Griffith, Kathleen Brockman, Nancy Burr, Miguel Franco, M.E. Franco, Joseph J. Jess, Connie L. Jess, Paul Marciel, Don Scullion, Trustee of the Greeley Estate, Agnes Martin, Doris E. House, DePaoli Equipment, Inc., a California corporation, Ray A. Petersen, Deborah Petersen, Ferrari Bros., a partnership, Rancho Arroyo de la Alameda, a general partnership, Helen I. Andrade, Plaintiffs,

v.

COUNTY OF ALAMEDA, a political subdivision of the State of California, Southern Pacific Transportation Company, a Delaware corporation, Santa Fe Pacific Realty Corporation, a Delaware corporation, Robert T. Knox, John George, Defendants.

### No. C-85-3394 WHO.

United States District Court, N.D. California.

Sept. 29, 1987.

Joseph M. Gughemetti, A Professional Corp., San Mateo, Cal., for plaintiffs.

Richard J. Moore, County Counsel, County of Alameda, Oakland, Cal., Lynn H. Pasahow, Rochelle Souza, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for County of Alameda, Southern Pacific Transp. Co., Santa Fe Pacific Realty Corp., Robert T. Knox and John George.

## OPINION AND ORDER

ORRICK, District Judge.

The major question considered in this action is whether plaintiff landowners become entitled to reversionary land interests in abandoned railroad rights-of-way. For the reasons set forth below, the Court finds that they do not.

### I

Plaintiffs are twenty-one landowners, or executors or trustees of landowners, challenging the transfer by Southern Pacific Transportation Company ("Southern Pacific") to the County of Alameda (the "County") of certain railroad rights-of-way located in two separate areas known as Niles Canyon Road (9.7 miles long) and the Altamont Pass (11 miles long), both within the County. They represent the overwhelming majority of all owners of land adjoining or underlying the rights-of-way in those two areas.

Defendants include the County, Southern Pacific, Santa Fe Pacific Realty Corporation ("Santa Fe"), and County Supervisors Robert T. Knox and John George ("Supervisors").

Plaintiffs' first amended complaint alleges violations of the federal Civil Rights Act, 42 U.S.C. §§ 1983 and 1985 (1981), the Public Lands Act, 43 U.S.C. § 912 (1986), and the Communications Act of 1934, 47 U.S.C. § 151 et seq. (1962). The complaint seeks damages under the federal Civil Rights Act as well as declaratory relief under all of the aforementioned acts.

Moreover, plaintiffs request a writ of mandate pursuant to §§ 1094.5 (1987) and 1085 (1980) of the California Code of Civil Procedure; a declaration of quiet title under the federal Public Lands Act and California law; damages against the Supervisors for waste of, and injury to, taxpayers' assets, property, and funds under § 526a of the California Code of Civil Procedure (1979); declaratory and injunctive relief; and attorneys' fees pursuant to the federal Civil Rights Act, 42 U.S.C. § 1988 (1981), and § 1021.5 of the California Code of Civil Procedure (1980).

Prior to trial, the Court dismissed plaintiffs' § 1985 claim as to all defendants except the County, and dismissed with prejudice plaintiffs' petition for a writ of mandate. Before trial, plaintiffs conceded that their claim under the Cable Communications Act of 1934 was no longer applicable.

Therefore, the following claims for relief remained prior to trial: (1) the federal Civil Rights Act; (2) the Public Lands Act; (3) the quiet title action; (4) the taxpayers' suit; and (5) declaratory and injunctive relief.

The gravamen of plaintiffs' complaint is the allegation that plaintiffs became entitled to reversionary land interests in the rights-of-way when, on September 13, 1982, the Interstate Commerce Commission ("ICC") approved Southern Pacific's "Notice of Exemption" for a relocation project under which Southern Pacific would abandon its line, and within one year thereafter the rights-of-way were not embraced in a public highway, pursuant to § 912 of the Public Lands Act. 43 U.S.C. § 912.

Defendants argue that, *inter alia*, no reversionary land interest in favor of plaintiffs ever vested because the ICC's aforementioned approval did not constitute a decree of abandonment of the rights-of-way by a court of competent jurisdiction or by act of Congress, as required under the Public Lands Act. Moreover, defendants contend, even if Congress delegated to the ICC its authority to decree or declare abandonment, the ICC never so decreed or declared as to the rights-of-way in question.

The issues are simple to state but difficult to resolve. The Court considers first the threshold question of whether an abandonment of the Niles Canyon Road and Altamont Pass rights-of-way has actually occurred.

At the outset, the Court notes that while the rights-of-way were embraced in a public highway legally established, there has been no decree or declaration of abandonment by a court of competent jurisdiction or congressional act. Therefore, neither the exception nor the rule set forth in § 912 of the Public Lands Act applies, and plaintiffs are not entitled to any reversionary right, title, interest, or estate in the rights-of-way.

II

The Court previously ruled that § 912 applies with full force to land grants from Congress to the railroads of the type involved here.

Section 912 provides in pertinent part that:

Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad ... and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in [whomsoever shall lawfully hold title to the underlying land, or have obtained the interest of the United States' title in such land]....

43 U.S.C. § 912.

For plaintiffs to prevail under § 912, the evidence must show that (1) Southern Pacific's use and occupancy of the rights-of-way for railroad purposes has ceased by forfeiture or by abandonment decreed or

declared by a court or congressional act, and (2) the rights-of-way have not been embraced in a public highway legally established within one year of the aforementioned decree or declaration of forfeiture or abandonment.

The Court will first address the question of whether the rights-of-way were ever embraced in a public highway legally established.

### A.

■ What constitutes a "highway" for purposes of the federal land grant statutes, i.e., § 912, is a question of state law. *See Standage Ventures, Inc. v. Arizona,* 499 F.2d 248, 250 (9th Cir.1974).

Plaintiffs contend that the rights-of-way were not embraced in a public highway legally established because the requirements of the California Environmental Quality Act ("CEQA"), were not satisfied. Cal.Pub.Res.Code § 21000 *et seq.* (1986). Defendants respond that the rights-of-way were embraced in a public highway legally established under both California common law and statutory law.

### 1.

California common law provides that where a county has been granted a right-of-way to be used for and devoted to the purposes only of a county road, the act of acceptance of the grant upon the part of the grantee county operates *ipso facto* to establish the right-of-way as a highway of the county. *Watson v. Greely,* 69 Cal.App. 643, 649, 232 P. 475 (1924). Moreover, state law holds that the grant and acceptance of the right-of-way constitutes a dedication of the strip to county road purposes. *Id.* No improvement of rights-of-way by a county is necessary to make them a highway. *Venice v. Short Line Beach Land Co.,* 180 Cal. 447, 181 P. 658 (1919).

■ Southern Pacific agreed to quitclaim the rights-of-way at issue to the County on April 23, 1985, with the County's agreement that it would place the rights-of-way "into the County's highway system to be used for highway and/or transportation related facilities purposes thereafter." Plain-

tiffs' Trial Exh. No. 56 and Defendants' Trial Exh. No. B (Southern Pacific/County Agreement) at 1, ¶ 1.

On April 23, 1985, the County "accepted" Southern Pacific's rights-of-way; "declared" the rights-of-way "to be part of the County System of Highways"; and "designated" the Altamont rights-of-way to be "a part of the Altamont Pass Transportation Corridor and/or County Road No. 8110," and the Niles Canyon rights-of-way to be "a part of Niles Canyon Transportation Corridor and/or County Road No. 8111." Defendants' Trial Exh. Nos. H and I, respectively (County Board Resolutions).

Based upon the foregoing evidence, Southern Pacific's grant of its rights-of-way to the County and the County's acceptance of them constituted an *ipso facto* establishment of a highway under California common law. *Watson, supra.*

### 2.

■ CEQA, on the other hand, requires that an Environmental Impact Report ("EIR") be prepared where the environment may be significantly affected by (1) an "intended" project, California Public Resources Code § 21151, or (2) a "proposed" project, *id.* at 21100. No EIR is required where it cannot be fairly argued on the basis of substantial evidence that a project may have significant environmental impact. *See Perley v. Board of Supervisors of Calaveras County,* 137 Cal.App.3d 424, 433 n. 4, 187 Cal.Rptr. 53 (1982).

■ A Negative Declaration was prepared in connection with the intended *acquisition* of Southern Pacific's rights-of-way and the *incorporation* of those rights-of-way into the County's highway system— *not* in connection with the *establishment* of a highway *as a highway.* Plaintiffs' Trial Exh. No. 69; Defendants' Trial Exh. No. L.

The Negative Declaration consists of a one-page cover sheet, initial study, checklist, area map, and location map. Paragraph "1" of the cover sheet refers to the *"acquisition"* of the rights-of-way, as does paragraph "I.A." of the initial study. Paragraph "I.F." of the initial study de-

scribes the project as follows: "Existing Southern Pacific Transportation Company railroad right-of-way ... to be *included* in the County System of Highways...." (Emphasis added.) Moreover, the bottom right-hand corner of the checklist reads as follows:

> [T]he *opportunity for future public transportation* is being *preserved.* The *acquisition* is consistent with ... policies to promote and protect forms of transportation which serve as an alternative to automobile use. The corridor will be *preserved* and *maintained* in the County System of Highways. *No physical changes* in the corridor are *contemplated at this time. Future changes, if any, will be reviewed in accordance with requirements of CEQA.*

(Emphasis added.)

Furthermore, the County represented in its memorandum in opposition to plaintiffs' petition for writ of mandate that:

> What the county in fact has approved is just the acts it already has taken: the *acceptance* of the donation of the rights-of-way from Southern Pacific and the *granting* of the easements to Southern Pacific. This of course means that when the county is prepared to adopt more specific plans for construction projects on the donated land, it will have to comply with CEQA's requirements before proceeding with those projects.... This is unequivocally explained in the County's Initial Study upon which the Board of Supervisors adopted the Negative Declaration:
>
> > No physical changes in the corridor are contemplated at this time. Future changes, if any, will be reviewed in accordance with the requirements of CEQA.

(Emphasis added.) County's Memorandum in Opposition to Plaintiff's Petition for Writ of Mandate, filed Aug. 2, 1985, at 8, 11. 11–26, 9, 11. 1–3.

Moreover, defendants' counsel told the Court at the October 4, 1985, hearing on the petition:

> The Negative Declaration ... explain[s] that none of these legal transactions have had any physical effect on the ... land, nor will they.... Future changes [to the corridor] ... will be reviewed in accordance with ... CEQA.... The County has never denied that before it ... does any work on any highways here it has the obligation to comply with state environmental laws; and it fully intends to.

Reporter's Transcript, filed Dec. 18, 1985, p. 19, 11. 11–25.

Based upon the foregoing, it is clear that under the Negative Declaration, the *acquisition* and *incorporation* of the rights-of-way into the County's highway system as a "legally established highway" took place pursuant to the requirements of CEQA. What is equally clear is that CEQA only stands as a bar to the County's *future use,* if any, of the legally established highway *as a highway* until a Negative Declaration or an EIR is prepared that addresses such use. Thus, even under California statutory law, the County embraced the rights-of-way in a public highway legally established.

## B.

Because the rights-of-way were embraced in a public highway legally established, the Court turns to the question of whether such incorporation occurred within one year of the cessation of Southern Pacific's use and occupancy of the rights-of-way for railroad purposes by abandonment decreed or declared by a court or congressional act. The absence of cessation by forfeiture is not at issue and, as such, is not discussed.

### 1.

The determination of the issue of whether Southern Pacific abandoned the rights-of-way within one year of the aforementioned cessation is to be resolved in accordance with the procedure utilized in *Idaho v. Oregon Short Line Railroad Co.,* 617 F.Supp. 213 (D.C.Idaho 1985) (hereinafter *"Idaho II "*). Memorandum and Order, filed Mar. 2, 1987, at 5, 11. 17–19. The Court will consider the factors and type of evidence considered by the court in *Idaho*

II. Memorandum and Order at 11, 11. 19–21.

In *Idaho II,* the court paraphrased § 912 and then stated:

As the Court reads § 912, the test regarding abandonment is that "use and occupancy" of the railroad right-of-way for railroad purposes must cease in order for abandonment to occur.

*Idaho II,* 617 F.Supp. at 216. Upon concluding that neither the use nor the occupancy of the right-of-way in question had ceased and, thus, no abandonment had occurred, the court made the following partial declaration:

2. In order for abandonment ... to occur in the future ... the following must occur:

a. The railroads must cease paying taxes;

b. The railroads must take up the tracks and other railroad structures or the line must become completely unusable, even for side track purposes;

c. The railroads must have the intent to abandon—as evidenced by statements and conduct;

d. The railroads must cease using the line for any railroad purpose;

e. This Court or Congress must decree that abandonment has occurred.

*Id.* at 218. In so declaring, the *Idaho II* court found that for there to be abandonment, there had to be (1) a cessation of use and occupancy, and (2) a decree by a court or Congress. The court did not reach the question of whether the ICC Certificate of Decision concerning the defendant railroads' abandonment[1] constituted the requisite decree or declaration by a court or a congressional act.

In their post-trial submissions, the parties in the instant action argue that the first prong, i.e., the date of cessation of physical use and occupancy, is irrelevant and immaterial, while the second prong, i.e., the date of a decree or declaration by a court or a congressional act, is controlling.

■ However, as the discussion of the *Idaho II* decision indicates, both parties in this action are in error. In order for there to be abandonment under § 912, there must be (1) a cessation of use and occupancy; *and* (2) a decree by a court or a congressional act that abandonment has occurred. *Idaho II,* 617 F.Supp. at 216, 218. Because the parties' primary disagreement is as to whether there has been the requisite decree, it is that question that the Court will first address.

### 2.

■ Plaintiffs argue that the ICC's approval of Southern Pacific's "Notice of Exemption" for a relocation project, under which Southern Pacific would abandon its line, amounts to the requisite congressional decree of abandonment.

Southern Pacific filed its Notice of Exemption on August 18, 1982. Plaintiffs' Trial Exh. 44B. Therein, it petitioned the ICC, pursuant to 49 U.S.C. § 10505,[2] for exemption from 49 U.S.C. §§ 10903–10907,[3] to allow it to abandon its railroad line.

The ICC prepared its Notice of Exemption on September 13, 1982. Therein, the ICC: (1) refers to Southern Pacific's Notice of Exemption; (2) cites the "relocation project" proposed by Southern Pacific and Western Pacific Railroad Company ("Western Pacific"); (3) states, "[u]nder the ...

---

1. The ICC certificate of abandonment contemplated, by its terms, that the railroad might choose not to proceed with "actual" abandonment. *Idaho v. Oregon Short Line Railroad Co.,* 617 F.Supp. 213, 217 (D.C.Idaho 1985) (hereinafter cited as *"Idaho II"*).

2. Section 10505 of Title 49 exempts a person from provisions of the interstate subtitle, i.e., §§ 10903–10907, when the provisions are (1) not necessary to carry out transportation policy, and (2) either (a) the transaction or service is of limited scope or (b) the application of provi-

sions are not needed to protect shippers from the abuse of market power.

3. Sections 10903–10907 of Title 49 pertain to (1) ICC's authorizing abandonment and discontinuance (§ 10903); (2) filing and procedure for applications to abandon or discontinue (§ 10904); (3) offers of financial assistance to avoid abandonment and discontinuance (§ 10905); (4) offering abandoned rail properties for sale for public purposes (§ 10906); and (5) exceptions (§ 10907).

project SPT will abandon its line ..."; and (4) indicates that the "project involves not only an abandonment but a trackage rights transaction." Plaintiffs' Trial Exh. No. 44.

Based on the foregoing evidence, it appears that the ICC granted Southern Pacific an exemption from abandonment requirements, 49 U.S.C. §§ 10903–10904, by referring to Southern Pacific's notice, which cited the abandonment procedure sections. Moreover, it appears that the ICC, in authorizing the exemption for the relocation project on September 13, 1982, authorized Southern Pacific's abandonment of its rights-of-way. 49 C.F.R. § 1180.4(g) (1986) at 518.

Plaintiffs, in arguing that the ICC's approval amounts to the requisite congressional act, rely upon the Supreme Court's pronouncement as to the power Congress has bestowed upon the ICC concerning the issue of abandonment, and cite the case of *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981), which provides:

> Congress has power to assume not only some control, but paramount control, insofar as interstate commerce is involved.... The *authority to find* the facts and to exercise thereon the judgment whether *abandonment* is consistent with public convenience and necessity, *Congress conferred upon the Commission.*

*Id.* at 321, 101 S.Ct. at 1132 (emphasis added), *citing Colorado v. United States,* 271 U.S. 153, 165–66, 46 S.Ct. 452, 454–55, 70 L.Ed. 878 (1926). The Court continues:

> The exclusive and plenary nature of the *Commission's authority* to rule on carrier's *decisions to abandon* lines *is critical to the congressional scheme,* which contemplates comprehensive administrative regulation of interstate commerce. In deciding whether to permit an *abandonment,* the Commission must balance "the interests of those now served by the present line on the one hand, and the interests of the carrier and the transportation system on the other." ... "The weight to be given to cost of a

relocated line as against the adverse effects upon those served by the abandoned line is a matter which the experience of the Commission qualifies it to decide. And, under the statute, it is *not a matter for judicial redecision.*"

*Id.* 450 U.S. at 321, 101 S.Ct. at 1132 (emphasis added), *citing Purcell v. United States,* 315 U.S. 381, 385, 62 S.Ct. 709, 711, 86 L.Ed. 910 (1942). Further, the Supreme Court in *Chicago & North Western* states:

> The *breadth of the Commission's statutory discretion suggests* a *congressional intent to limit judicial interference* with the agency's work....
>
> ... Congress granted to the Commission plenary authority to regulate ... rail carriers' cessations of service on their lines. And *at least as to abandonments, this authority is exclusive.*

*Id.* 450 U.S. at 321–323, 101 S.Ct. at 1132–33 (emphasis added).

### 3.

■ Even assuming, *arguendo,* that the ICC's approval of Southern Pacific's "Notice of Exemption" did amount to the requisite congressional act, it is clear that plaintiffs are not entitled to any reversionary right, title, interest, or estate in the rights-of-ways. In this case, the other prong of the *Idaho II* interpretation of the requirements for abandonment under § 912, i.e., the cessation of use and occupancy, has not been met.

Faced with an absence of case law construing the terms "use," "occupancy," and "[railroad] purposes," the *Idaho II* court looked to the plain and apparent meaning of the terms, as well as the common law definition of abandonment, in deciding whether the railroad's use and occupancy of the right-of-way in question had ceased. *Idaho II,* 617 F.Supp. at 217. Under both approaches, the court concluded that the railroad had not abandoned the right-of-way. *Id.* at 217–18.

Using the "plain and apparent meaning of the terms" approach, the court in *Idaho II* found that the railroad had continued to use the right-of-way where (1) the railroad continued to store not only 600–700 rail-

road cars awaiting repair, dismantling, sale, or further service, but also ties, rails, ballast, and fill, on portions of the right-of-way in question; and (2) the record showed that the line might be required to store even more cars to be used for some other purpose at some future time. Moreover, the *Idaho II* court also found that the railroad continued to occupy the right-of-way where (1) there had been no removal of trackage or other railroad structures along the line, and (2) the railroad had paid and continued to pay property taxes for the right-of-way.

Furthermore, under the common law test for abandonment,[4] which looks to (1) a present intent to abandon and (2) physical acts evidencing clear intent to relinquish the property interest, the court in *Idaho II* held that the requisite intent did not exist. The abandonment test enunciated in *Idaho II* is consistent with that which exists under California law.[5] The Court in *Idaho II* found it insufficient that (1) defendants contemplated, discussed or even made preliminary plans toward abandonment of the right-of-way; (2) defendants applied to the ICC for authorization to discontinue service on the right-of-way, in the event that the railroad chose to proceed with "actual" abandonment;[6] and (3) the railroad discontinued its services (though chose to convert the line to side track, which is a recognized use of railroad line). *Id.* at 217–18. The

court also found that there were insufficient physical acts to constitute abandonment.

The court in *Idaho II* then went on to state that abandonment was generally found only where all or most of the following acts had occurred:

1. Railway service had been discontinued;

2. Trackage and other railroad structures had been removed;

3. Right-of-way had not been used for any railroad purpose;

4. Maintenance of the line had been discontinued.

*Id.* at 218. In contrast, the court explained, if some or all of the following occurred, abandonment generally was not found:

1. The railroad had paid taxes on the right-of-way;

2. The right-of-way was used for some railroad purpose even if railroad service had been discontinued;

3. Trackage was left intact along with other railroad structures such as bridges, ballast, and barricades....

*Id.*

In this case, the evidence reveals a number of things.[7] First, it is clear that Southern Pacific paid taxes on the rights-of-way

---

**4.** The court in *Idaho II,* 617 F.Supp. at 217, stated:

The classic statement of the rule is that for abandonment to occur there must be (1) present intent to abandon, and (2) physical acts evidencing clear intent to relinquish the property interest. *See, e.g.,* J. CRIBBETT, *Principles of the Law of Property,* p. 345–46 (2d ed. 1975); *O'Brien v. Best,* 68 Idaho 348, 194 P.2d 608, 613 (1948).

**5.** The basic test of abandonment under California law is whether there is concurrent evidence of nonuse and a present intent to abandon. *See Cash v. Southern Pacific Railroad Co.,* 123 Cal. App.3d 974, 978, 177 Cal.Rptr. 474 (1981), *citing Wood v. Etiwanda Water Co.,* 147 Cal. 228, 234, 81 P. 512 (1905) ("The mere intention to abandon, if not coupled with yielding up possession or a cessation of user, is not sufficient; nor will the non-use alone, without an intention to abandon be held to amount to an abandonment.' "); *Faus v. City of Los Angeles,* 67 Cal.2d 350, 363, 62 Cal.Rptr. 193, 431 P.2d 849 (1967).

**6.** *See* n. 1, *ante.*

**7.** Plaintiffs object to the introduction of exhibits and declarations, including those of the County and Southern Pacific, as hearsay. Plaintiffs contend that "the County's declarations are of individuals who have not been deposed, and who for which the plaintiffs have not had an opportunity of cross-examination." Plaintiffs' Submittal of Declarations re Evidence of Abandonment, filed Mar. 17, 1987, at p. 2, ll. 1–6. The Court overrules plaintiffs' objection, in light of the fact that plaintiffs were told during trial on March 4, 1987, to file counterexhibits and declarations if they deemed such to be appropriate, and that plaintiffs failed to do so. Moreover, the Court notes, as the following discussion indicates, that some of plaintiffs' declarations submitted before trial contradict plaintiffs' own deposition testimony.

through March 31, 1985. Anton Ranuio[8] stated in his declaration that:

4. For the California property tax year 1984–1985 [3/31/84—3/31/85] Southern Pacific paid property taxes on the transferred rights-of-way as "Operating Property." For the California property tax year 1985–1986 [3/31/85—3/31/86] Southern Pacific paid property taxes on its interest in the transferred rights-of-way as "Nonunitary" or "Non-operating Property."

Declaration of Anton Ranuio Re Abandonment, filed Feb. 26, 1987, p. 2, ¶ 4.

Second, the rights-of-way were used for some railroad purpose, even if railroad service was discontinued. Kenneth B. Derr[9] declared in his declaration that:

4. The rights-of-way through Niles Canyon and Altamont were maintained and used by Southern Pacific as a secondary route into the Bay Area from the Central Valley. Additionally, they were used to serve local customers located along the rights-of-way.

5. Apart from temporary disruptions, the rights-of-way continuously served the roles described in the prior paragraph through March 1983....

.    .    .    .    .

9. After March 1983, Southern Pacific used the section of track east of the damaged portion at approximately milepost 56.6 and west of Tracy, between approximately mileposts 59 and 66.5, for the storage of box cars.

Declaration of Kenneth B. Derr Re Abandonment (hereinafter "Derr Declaration"), filed Feb. 26, 1987, at 2–3 ¶¶ 4–5, 4, ¶ 9. Furthermore, Lawrence M. Weller[10] stated in his declaration:

2. Between March and August 1985 training exercises were held by Southern Pacific to train employees as engineers and groundsmen. These training exercises involved the operation of engines and cars over the Southern Pacific tracks in the Altamont Pass area east of Ulmar and west of Tracy.

.    .    .    .    .

5. During the months April through August 1985 I personally was present at the training exercises, and repeatedly saw and drove engines operating in the areas described above.

Declaration of Lawrence M. Weller Re Abandonment, filed Feb. 26, 1987, at 1–2, ¶¶ 2, 5.

The deposition testimony of plaintiff Robert A. Vieux, while in conflict with his declaration filed March 17, 1987,[11] tends to substantiate the foregoing declarations. Vieux stated at his deposition that the last time any sort of train went across the right-of-way on his property was "a year and a half ago [before December 1986] ... [m]aybe two years [ago] [before December 1986]," i.e., between January 1985 and June 1985. Deposition of Robert Alfred Vieux (hereinafter "Vieux Deposition"), filed Jan. 21, 1987, at 19, 11. 15–19.

The deposition of plaintiff Joseph John Jess, while also inconsistent with his declaration filed March 17, 1987,[12] indicates that

---

8. Ranuio is the Senior Manager of Property Accounting, for Southern Pacific. Ranuio Declaration at 1, ¶ 1. He is responsible for the accurate recording in Southern Pacific's accounting records of investment and retirement costs of all roadway, facilities, and equipment of the company, as well as the preparation of Southern Pacific's property tax reports for the states of California, Utah, and Nevada. *Id.*

9. Derr is Office Engineer for the Western Division of Southern Pacific. Derr Declaration at 1, ¶ 1. His current responsibilities include overseeing all new design, construction, and leasing of property and the abandonment and retirement of tracks in the Western Division. *Id.* at ¶ 2. The tracks at issue in the Niles Canyon and

Altamont Pass areas are located in the Western Division. *Id.* at 2, ¶ 2.

10. Weller is Safety Officer for the Western and San Joaquin Division of Southern Pacific. Weller Declaration, at 1, ¶ 1.

11. Vieux states in his declaration that "[f]rom and after March 1983, a train never traveled passed [*sic*] the wash-out to Tracy. In June 1986, the remainder of the tracks in the area [of our property] were removed and the right-of-way [was] graded." Vieux Declaration at 1–2, ¶ 3.

12. Jess states in his declaration that from early 1983 on, he never saw any trains pass over the area where a slide occurred to Tracy because

Southern Pacific placed cattle guards at the two points where fencing crossed the tracks in order to permit trains to move across his property without letting the cattle out in the summer of 1984 or 1985; and that the last time a Southern Pacific train crossed his property was "either last summer or the summer before," i.e., the summer of 1985 or 1986. Deposition of Joseph John Jess (hereinafter "Jess Deposition"), filed Jan. 21, 1986, at 43–45, 50, 11. 11–22.

Third, the evidence shows that trackage was left intact along with other railroad structures. Plaintiff Ralph Pombo stated in his declaration that it was not until May 1986 that Southern Pacific ripped out the tracks remaining after the 1983 winter storm on the Altamont Pass rights-of-way. Declaration of Ralph Pombo in Support of Evidence of Abandonment, filed Mar. 17, 1987, at 1, ¶ 2. Plaintiff Vieux also stated at his deposition that the last permanent barriers to cross the rights-of-way coming into contact with his Altamont Pass property were Southern Pacific's tracks and ties, and that those barriers were not removed until August 1986. Vieux Deposition at 18, 11. 12–27. Plaintiff Jess also stated at his deposition that Southern Pacific's tracks and ties remained until "last summer sometime," i.e., summer 1986. Jess Deposition, at 13, 11. 8–12.

Fourth, Southern Pacific's statements and conduct did not reflect an intent to abandon the rights-of-way before the Southern Pacific and Western Pacific tracks were connected in April 1985. Southern Pacific's aforementioned ICC "Notice of Exemption" states: "SPT would not exercise its abandonment exemption authority, if granted, until and unless the SPT–WP trackage rights agreement had been approved by the Commission." Plaintiffs' Trial Exh. No. 44B at 3. Moreover, Derr stated in his declaration:

3. ... Southern Pacific never contemplated ending its use of its tracks in the Niles Canyon and Altamont Pass areas until the connections were completed and the joint track operation agreement became effective.

Derr Declaration, at 2, ¶ 3.

Finally, the evidence shows that maintenance of the rights-of-way was not discontinued. Derr stated in his declaration that after the winter storms in 1983, during which Southern Pacific's Niles Canyon track was damaged, necessary repairs were timely made to return the track to regular service. *Id.* at 3. ¶ 7. Moreover, he stated that both before and after March 1983 the tracks in both the Niles Canyon and Altamont Pass areas continued to be inspected by Southern Pacific throughout their entire length. *Id.* at 3, ¶ 8. On occasion Derr performed the inspections, and, in doing so, he rode on the tracks in a "highrailing vehicle." *See id.* at 3–4, ¶ 8.

Based upon the foregoing, it is clear that there was no cessation of physical use and occupancy of the rights-of-way until April 1985, at the earliest, when Southern Pacific intended to discontinue its use and occupancy of the rights-of-way in connection with its relocation project. Even then, it can still be argued that there was no abandonment until after August 1985, when Southern Pacific completed its training exercises and ceased both its use and occupancy of the rights-of-way for the railroad and railroad structures. Thus, neither the exception nor the rule set forth in § 912 applies, and plaintiffs were not and are not entitled to any reversionary right, title, interest, or estate in the rights-of-way.

### III

Plaintiffs claim under the federal Civil Rights Act that defendants' actions in concert violated their reversionary property rights, which were taken without due process of law or just compensation. *See* Plaintiffs' Trial Brief, filed Jan. 21, 1987, at 2, ¶ 1. Because the rights-of-way never became those of plaintiffs, their claim under § 1983, as well as their quiet title action, fails.

---

the slide prevented the right-of-way from being usable for trains. Jess Declaration at 1, ¶ 2. Jess also states, "[s]tarting in the last quarter of 1985, the tracks crossing my property began to be ripped out and the property graded. By May 1986, all tracks on my property were removed." *Id.* at 1–2, ¶ 3.

Moreover, plaintiffs contend that defendant Supervisors improperly diverted and wasted public funds and assets when the County agreed to: (1) indemnify and hold harmless Southern Pacific for any violation of plaintiffs' federal rights; (2) condemn a twenty-mile stretch of property for Southern Pacific's requested fiber optics easement at no cost to the railroad; and (3) indemnify Southern Pacific, at no cost to the railroad, for all losses in this action, if it were found that Southern Pacific's prior title claims were defective, or that Southern Pacific had violated plaintiffs' rights. *Id.* at 3, ¶ 4. Plaintiffs also seek declaratory and injunctive relief precluding the parties from violation of plaintiffs' rights, and federal and state law. *Id.* at 4, ¶ 5. Both these claims fail as well in light of the foregoing holding.

## IV

In view of the evidence presented, and the discussion of the applicable authority, the Court finds that while the rights-of-way were embraced in a public highway legally established as of April 23, 1985, there has been no decree or declaration of abandonment by a court of competent jurisdiction or a congressional act. Moreover, the Court finds that under either the "plain and apparent meaning" approach or the common law test of abandonment used in *Idaho II,* there was no cessation of use or occupancy of the rights-of-way until April 1985, at the earliest. As such, neither the exception nor the rule set forth in § 912 applies, and plaintiffs were not and are not entitled to any reversionary right, title, interest, or estate in the rights-of-way. Accordingly, based upon this finding, plaintiffs' additional claims fail.

The foregoing constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

Defendants shall submit a judgment, approved as to form by plaintiffs, on or before October 6, 1987.