[No. A102287. First Dist., Div. One. Aug. 2, 2004.]

TONY BELLO et al., Plaintiffs and Appellants, v.
ABA ENERGY CORPORATION, Defendant and Appellant.

**COUNSEL**

Bernheim, Gutierrez & McCready and William S. Bernheim for Plaintiffs and Appellants.

Downey Brand, Julie A. Carter, Tracy K. Hunckler, and David A. Livingston for Defendant and Appellant.

Jennifer Henning for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

Anderson & Poole, Edward G. Poole and Shannon M. Childs for California Natural Gas Producers Association as Amicus Curiae on behalf of Defendant and Appellant.

**OPINION**

**MARGULIES, J.**—Plaintiffs own a parcel of land in rural Solano County bounded by a county road. The land underlying and immediately adjoining the road is subject to a public right-of-way. Defendant ABA Energy Corporation (ABA) is a private company that operates a natural gas field located near plaintiffs' parcel. After obtaining an appropriate permit from the county, but without notice to plaintiffs, ABA installed a pipeline in the right-of-way on plaintiffs' land to transport natural gas recovered from ABA's drilling operations. Plaintiffs sued for trespass, contending that ABA was required to obtain their consent before laying pipe in the right-of-way. The trial court agreed with plaintiffs, finding that ABA's pipeline constituted a trespass, but the court refused to require ABA to remove the line and awarded only nominal damages.

ABA contends that the trial court erred in finding a trespass. Plaintiffs contend in their cross-appeal that the trial court erred in permitting the

pipeline to remain, in awarding only nominal damages, and in refusing to award attorney fees. We reverse the trial court's finding that ABA is a trespasser, direct entry of judgment for ABA, and dismiss plaintiffs' cross-appeal as moot.

## I. BACKGROUND

Plaintiffs Tony, Virginia and Frank Bello (Bellos) are the trustees of three living trusts that together own a 320-acre parcel of agricultural land in Solano County. At the time of trial, the parcel was farmed by tenants and planted with clover and alfalfa. The northern border of the Bellos' property is subject to a 30-foot-wide public right-of-way in favor of the county. The full width of the right-of-way is 60 feet, containing a 30-foot-wide paved county road, Midway Road, and 15 feet of unpaved reserve on either side. Because the right-of-way is shared by the parcel across the road, the Bellos' parcel supports one longitudinal half of the road and one of the unpaved shoulders.

ABA is a privately owned natural gas exploration and production company. In the year 2000, ABA drilled natural gas wells on property near the Bellos' parcel. ABA anticipated that the unprocessed natural gas recovered from these wells would be transported by pipeline to a metering station operated by the local natural gas utility, Pacific Gas & Electric Company (PG&E). At that point, ABA's gas would be mixed with gas from other producers. ABA's customers, rather than receiving the actual gas recovered by ABA, would be entitled to draw from PG&E's natural gas delivery system a cubic yardage equivalent to that delivered into the system by ABA. As ABA's president testified, the system "is similar to a bank."

To transport the gas recovered from the well, ABA applied to the county for a right-of-way encroachment permit authorizing the burial of a four-mile-long, four-inch metal pipeline in the shoulder along local roads. Approximately one mile of the proposed pipeline was to be buried in the right-of-way alongside Midway Road, including that portion of Midway Road on the Bellos' parcel. The county approved the permit, and ABA installed the pipeline. ABA neither sought nor received the consent of the underlying landowners to installation of the pipeline.

The Bellos filed this action for trespass and ejectment after ABA had completed construction of the pipeline. Their complaint asserted that ABA was required to obtain their consent prior to burying a pipeline in the roadway right-of-way on their property and sought damages and an injunction requiring ABA to remove the pipeline.

The case was tried without a jury. In its statement of decision, the trial court concluded that ABA's installation of the pipeline was not within the

scope of uses permitted in the public right-of-way because "[t]he installation of a natural gas pipeline within [the] easement is not a use incidental to the road purposes for which the right-of-way was acquired by the county." Based on its conclusion that the pipeline was not a proper use of the right-of-way, the court found that ABA, having never obtained the Bellos' consent to installation of the pipeline, was a trespasser. Nonetheless, the court granted only nominal damages, finding that the pipeline did not interfere with the Bellos' use of their land and that they had provided no evidence to support their claim that the pipeline had diminished the value of their property. Because ABA's trespass was made in good faith and did not injure the Bellos, the court found that the balance of hardships weighed against their request for removal of the pipeline and denied injunctive relief. The trial judge also declined to award attorney fees.

## II. DISCUSSION

We first address ABA's contention that the trial court erred in finding that it was required to obtain the Bellos' consent before installing a pipeline in the public right-of-way on their property.[1] Although the trial court cited no legal authority in its decision, the language of its ruling suggests that the court was relying on *Gurnsey v. Northern California Power Co.* (1911) 160 Cal. 699 [117 P. 906] (*Gurnsey*), in which the Supreme Court held that the defendant's installation of electrical transmission poles and lines in the right-of-way along a "public wagon road" across a "large tract of land" in Tehama County (*id.* at p. 702) constituted a trespass because the electric lines did not serve "purposes incidental to the effective use by the public of the highway." (*Id.* at p. 705.)

*Gurnsey* represents one of two distinct lines of authority in the Supreme Court's right-of-way jurisprudence. The second line was established nearly 20 years prior to *Gurnsey* by *Montgomery v. Santa Ana Railway Company* (1894) 104 Cal. 186 [37 P. 786] (*Montgomery*), in which the Supreme Court allowed an interurban railway to be constructed in a public right-of-way without the landowner's consent. *Montgomery* holds that, as a result of the demands of urbanization, public rights-of-way located in developed areas are subject to a wide range of "other and further uses" besides surface transportation, including the installation of sewage, water, gas, and communications lines. (*Id.* at p. 189.) This expansive approach was reaffirmed by *Colegrove W. Co. v. City of Hollywood* (1907) 151 Cal. 425 [90 P. 1053] (*Colegrove*), decided only four years prior to *Gurnsey.*

---

[1] Because it is a pure issue of law, this question must be reviewed "under a nondeferential standard, affording plenary review." (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

We find *Gurnsey* distinguishable in these circumstances and hold that the standard adopted in *Montgomery* governs use of the right-of-way along the Bellos' property. The rule of law announced by *Gurnsey* is applicable only to rights-of-way that have yet to be subjected to the "other and further uses" that are incident to modern development. (*Montgomery, supra,* 104 Cal. at p. 189.) Because public rights-of-way even in rural portions of the San Francisco Bay Area are now subject to the intensive use described in *Montgomery*, the rule of law adopted in that case must govern here.

## A. *The Supreme Court's Public Right-of-way Jurisprudence*

■ A public right-of-way is a form of easement, in that it grants use rights in a particular parcel of land to nonowners of the land. (Civ. Code, § 801, subd. (4); *City of Manhattan Beach v. Superior* Court (1996) 13 Cal.4th 232, 240 [52 Cal.Rptr.2d 82, 914 P.2d 160].) A private easement ordinarily vests those use rights in the owner of a particular parcel of neighboring property, the "dominant tenement." (*Moylan v. Dykes* (1986) 181 Cal.App.3d 561, 568 [226 Cal.Rptr. 673].) Unlike a private easement, the use rights of a public right-of-way are vested equally in each and every member of the public. (*In re Anderson* (1933) 130 Cal.App. 395, 398–399 [19 P.2d 1027].) The city or county government ordinarily administers use of the right-of-way. (E.g., Sts. & Hy. Code, §§ 1450, 1460.)

The late 19th century saw a dramatic change in the judicially recognized scope of public rights-of-way in California. Before the widespread adoption of railroads, electricity, and the telephone, the term "right-of-way" was given its literal meaning—a public right to construct, maintain, and use a road over private land. Any other use required the landowner's consent. (See, e.g., *Muller v. Railway Co.* (1890) 83 Cal. 240, 243–244 [23 P. 265]; *S.P.R.R. Co. v. Reed* (1871) 41 Cal. 256, 261–262.) Shortly before the turn of the century, however, the Supreme Court recognized that urbanization was placing a much greater demand on public resources than could be accommodated by this literal view of public rights.

In *Montgomery*, the court expressly overruled the prevailing narrow interpretation of rights-of-way in holding that a municipality could grant a private company the right to construct and operate a railroad in a public right-of-way without the landowner's consent. Summarizing its holding, the *Montgomery* court "affirm[ed] that when a public street in a city is dedicated to the general use of the public, it involves its use subject to municipal control and limitations for all the uses and purposes of the public as a street, including such methods for the transportation of passengers and freight as modern science and improvements may have rendered necessary, and that the application of these methods and indeed of those yet to be discovered, must have

been contemplated when the street was opened and the right of way obtained, . . . and hence that such a user imposes no new burden or servitude upon the owner of the abutting land." (*Montgomery, supra,* 104 Cal. at pp. 191–192.)

In justifying this departure from what the court acknowledged was contrary prior precedent, it summed up the basis for its holding in three words: "The world moves. . . . [¶] The trend of judicial opinion . . . is to a broader and more comprehensive view of the rights of the public in and to the streets and highways of city and country . . . ." (*Montgomery, supra,* 104 Cal. at p. 192.) The court was not deterred by its recognition that in granting a broad scope to public rights it was depriving underlying landowners of the rights of use and control that traditionally accompany private land ownership. On the contrary, it quoted approvingly an Oregon case which concluded that " '[t]he establishment of a public highway practically divests the owner of a fee to the land upon which it is laid out of the entire present beneficial interest of a private nature which he has therein. It leaves him nothing but the possibility of a reinvestment of his former interest in case the highway should be discontinued as such. . . .' " (*Id.* at p. 193, quoting *Paquet v. Mt. Tabor St. R'y Co.* (1889) 18 Or. 233, 235 [22 P. 906, 907].)

The *Montgomery* court expressly limited the application of its ruling to areas in which the public rights-of-way were being used to contain significant public infrastructure. Before stating its holding, the court noted that there is a "wide distinction between a highway in the country and a street in a city or village, as to the . . . servitude in the land upon which they are located." (*Montgomery, supra,* 104 Cal. at p. 188.) This "wide distinction" was not based on any inherent difference between rights-of-way in city and countryside. Rather, it was based on the practical recognition that development was placing ever-greater demands on streets in urban areas—demands that, in 1894, had not yet reached the enormous expanse of California outside its cities. As the court noted, while country roads were used only for surface transit, "[i]n the case of streets in a city there are other and further uses, such as the construction of sewers and drains, laying of gas and water pipes, erection of telegraph and telephone wires, and a variety of other improvements, beneath, upon, and above the surface, to which in modern times urban streets have been subjected." (*Id.* at p. 189.)

The expansive interpretation of rights-of-way in developed areas was reaffirmed in *Colegrove, supra,* 151 Cal. 425, which concerned the right of an underlying landowner to lay pipe in a previously dedicated roadway right-of-way. The road in question ran through a lemon orchard in the City of Hollywood—a developed area, by the court's reckoning, despite the property's agricultural use. (*Id.* at p. 427.) Discussing the scope of the right-of-way, the court noted that "[i]n city streets the easement of the public is, as a result

of the conditions of urban life, more extensive than in roads through sparsely inhabited regions. In cities, it is customary to devote not only the surface of the street and the space above the street to public use, but the municipality may, and frequently does, occupy the soil beneath the surface for the accommodation of sewers, gas and water pipes, electric wires, and conduits for railroads. Where the city undertakes to occupy the space above or below the surface of the street for any purpose within the scope of the public uses to which highways may be put, the use by the owner of the fee must yield to the public use." (*Id.* at pp. 429–430.) *Colegrove* also recognized that the scope of roadway rights-of-way is not fixed but responds to changing societal conditions, noting that " '. . . [t]his right of the owner may grow less and less as the public needs increase . . . .' " (*Id.* at p. 430, quoting *Allen v. Boston* (1893) 159 Mass. 324, 335 [34 N.E. 519].)

Four years later, in *Gurnsey,* the Supreme Court had occasion to rule on the scope of public rights-of-way underlying what *Colegrove* had described as "roads through sparsely inhabited regions." (*Colegrove, supra,* 151 Cal. at p. 429.) At issue was the scope of a public right-of-way underlying a 40-year-old "public wagon road" crossing a large ranch in Tehama County. (*Gurnsey, supra,* 160 Cal. at p. 702.) The defendant power company had obtained a franchise from the county that permitted it to erect poles and string electrical transmission wires in public rights-of-way. (*Ibid.*) Relying on that franchise, it ran wires along the road crossing the plaintiff's ranch to bring electricity to two other private ranches. (*Id.* at pp. 707–708.) In ruling on the scope of this right-of-way, the court held that "[a]ll that the public acquires under the easement is declared by [former] section 2631 of the Political Code, as follows: 'By taking or accepting land for a highway, the public acquire only the right of way, and the incidents necessary to enjoying and maintaining the same . . . .' " (*Id.* at p. 705.)[2] Acknowledging the statutory right of the local government to grant franchises to private companies for "lawful" use of the right-of-way, the court held that the lawful uses of the wagon road were restricted to "something which will promote the public comfort and convenience in the use of the highway." (*Gurnsey,* at p. 706.) Because the defendant's power lines served no transit-related function, the *Gurnsey* court found them not to be "incident" to the wagon road and therefore to be outside the rights granted to the public in the right-of-way. (*Id.* at p. 709.)

Since *Gurnsey,* the Supreme Court has only twice addressed the scope of roadway rights-of-way, both times adopting a broad construction. In *Hayes v.*

---

[2] Former Political Code section 2631 has long since been repealed. In 1935, a somewhat amended section 2631 was recodified as former Streets and Highways Code section 905. (See Stats. 1935, ch. 29, § 905, p. 303; Stats. 1935, ch. 29, §§ 14, 15 & 25, p. 249.) In 1961, the Legislature repealed section 905, enacting no similar statute to take its place. (Stats. 1961, ch. 1788, § 2, p. 3803; *Abar v. Rogers* (1972) 23 Cal.App.3d 506, 512, fn. 3 [100 Cal.Rptr. 344].)

*Handley* (1920) 182 Cal. 273 [187 P. 952], the court reaffirmed *Montgomery* and *Colegrove*, holding that the City of Los Angeles was permitted to construct a traffic tunnel beneath a street without paying compensation to abutting landowners. In doing so, the court quoted the expansive view of public rights-of-way from both *Colegrove* (" '. . . [i]t is well settled that the manner and extent of such public use is not limited by any standard of methods of use in vogue at the time of dedication. . . .' ") and *Montgomery* (a public right-of-way includes " ' ". . . such methods for the transportation of passengers and freight as modern science and improvements may have rendered necessary . . . and, indeed, of those yet to be discovered . . . ." ' "). (*Hayes v. Handley,* at p. 282.) Somewhat more recently, in *Faus v. City of Los Angeles* (1967) 67 Cal.2d 350 [62 Cal.Rptr. 193, 431 P.2d 849], the court again applied a flexible approach, holding that a public easement granted expressly for the operation of an electric interurban railway must be interpreted to allow the operation of equivalent motorbus service. Although the decision was not a general pronouncement on the scope of roadway rights-of-way, being limited to the specific language of the easement dedication, it interpreted that language broadly, holding that such easements are deemed " '. . . to have been intended to accommodate future needs.' [Citation.] Our courts have been receptive to the contention that changed economic and technological conditions require reevaluation of restrictions placed upon the use of real property . . . . [Citations.]" (*Id.* at p. 355.)

The Courts of Appeal have also consistently adopted a broad and flexible interpretation of the scope of public rights-of-way. In *In re Anderson, supra,* 130 Cal. App. 395, the court approved the establishment of a public market in Los Angeles as an appropriate use of a public right-of-way. In discussing the breadth of uses permitted in a right-of-way, the court quoted approvingly an earlier Massachusetts case, which held: " ' "The easement which the public acquires includes every reasonable means of transportation for·persons, and commodities, and of transmission of intelligence which the advance of civilization may render suitable for a highway[,]" ' " including " ' "gas and water pipes, sewer, telephone, telegraph, electric light and power poles, wires and conduits, electric and horse railways, the . . . subway and private railroads . . . ." ' " (*Id.* at p. 398, quoting *Commonwealth v. Morrison* (1908) 197 Mass. 199, 203 [83 N.E. 415, 416].) Other decisions have echoed this breadth. (See, e.g., *Galeb v. Cupertino Sanitary Dist.* (1964) 227 Cal.App.2d 294, 303 [38 Cal.Rptr. 580] [right-of-way includes below-ground use rights]; *Mancino v. Santa Clara County Flood etc. Dist.* (1969) 272 Cal.App.2d 678, 682 [77 Cal.Rptr. 679] [same]; *Smith v. County of San Diego* (1967) 252 Cal.App.2d 438, 444 [60 Cal.Rptr. 602] [approving a flood control channel as a proper use, holding that "[a]ny use which was rendered necessary for the public by future development or discovery would also have been contemplated"]; *Norris v. State of California ex rel. Dept. Pub. Wks.* (1968) 261

Cal.App.2d 41, 47 [67 Cal.Rptr. 595] [" '[w]hen land is taken or dedicated for use as a highway, the taking or dedication should be presumed to be not merely for such purposes and uses as were known and customary, at that time, but also for all public purposes, present or prospective, whether then known or not, consistent with the character of such highways . . . .' "]; *Collopy v. United Railroads* (1924) 67 Cal.App. 716, 723 [228 P. 59] [highway right-of-way includes "new and improved methods" of transportation, such as rail].)

B. *Applying Montgomery and Gurnsey*

■ The rule of *Montgomery* and *Colegrove,* rather than the rule of *Gurnsey,* is more appropriate for the right-of-way at issue here. Both *Montgomery* and *Colegrove* justified their adoption of a broad interpretation of public rights by the need to accommodate the extensive infrastructure that accompanies modern development. (See *Montgomery, supra,* 104 Cal. at p. 189; *Colegrove, supra,* 151 Cal. at p. 429.) As summed up by *Colegrove,* the scope of public rights-of-way in developed areas is "more extensive" because of the need to "accommodat[e] . . . sewers, gas and water pipes, electric wires, and conduits for railroads." (*Colegrove,* at p. 429.) In areas where intensive use of the rights-of-way is necessary to support public infrastructure, "the use by the owner of the fee must yield to the public use." (*Id.* at p. 430.) In contrast, the right-of-way under consideration in *Gurnsey,* a "wagon road," appears to have been used solely for private surface transportation. (*Gurnsey, supra,* 160 Cal. at p. 702.) It crossed land that was "sparsely inhabited" (*Colegrove,* at p. 429) and, because the area had yet to receive even electricity, presumably also lacked the other public infrastructure that served to justify a broad scope in *Montgomery* and *Colegrove.* (See *Montgomery, supra,* 104 Cal. at p. 189; *Colegrove, supra,* 151 Cal. at p. 429.)

Since 1894, the intensive use of rights-of-way found in *Montgomery* and *Colegrove* has migrated with city populations into the countryside. Today, much of California now shares in the type of public services described in *Montgomery* and *Colegrove,* which have only expanded in number since the turn of the century. Rural homes that once used a well and a septic tank or outhouse are now often connected to a water main and sewer. Drainage lines are common. Rural electricity, a novelty in 1900, is universally available, as is the telephone—a service similarly restricted to urban areas at the turn of the century. Now added to these is the availability of cable television and even the Internet, causing the rights-of-way in the countryside to be as filled with the transmission hardware of public services as were city rights-of-way in the time of *Montgomery* and *Colegrove.*

Rural Solano County is no exception.[3] The advance of public services into the Solano County countryside is dramatically illustrated by the record in this case. ABA had originally intended to bury its pipeline in the shoulder on the opposite side of Midway Road, an arrangement that would have avoided the Bellos' property altogether. The change in routing occurred because, upon opening a trench on the opposite side of the road, ABA discovered that the right-of-way was already occupied by fiber-optic cable laid down by AT&T.

Although it may be objected that the scope of public rights in a right-of-way should not depend upon trends of development beyond the control of local landowners, the Supreme Court instructed to the contrary in *Colegrove*, holding that " '. . . [t]his [residual] right of the owner may grow less and less as the public needs increase . . . .' " (*Colegrove, supra,* 151 Cal. at p. 430, quoting *Allen v. Boston, supra,* 34 N.E. 519.) It is important to remember that the "modern" trend—which began in California with *Montgomery* in 1894—is to construe public rights-of-way to accommodate technological advancement in the conveyance of goods and people, an approach that has been adopted invariably by California courts in right-of-way decisions since *Gurnsey*.

This flexible approach is consistent with the conclusions reached by courts in most other states. In addition to the pioneering decisions from Massachusetts and Oregon dealing primarily with urban areas, cited in *Montgomery* and *Colegrove,* a predominant plurality of states has adopted a broad scope for rights-of-way outside cities. Notably, Ohio courts had originally developed a distinction between the scope of rights-of-way in developed and rural areas similar to that drawn by *Montgomery* and *Gurnsey*. However, in *Ziegler v. Service Co.* (1969) 18 Ohio St.2d 101 [247 N.E.2d 728], the Ohio Supreme Court concluded that "the steadily increasing process of rural urbanization" had rendered the distinction untenable. (247 N.E. at pp. 729, 731.) Accordingly, the court allowed the installation of a water line in a rural right-of-way without the consent of or compensation to the landowner, adopting a uniformly broad scope for rights-of-way regardless of location. In *Bogart v. CapRock Communications Corp.* (2003) 2003 OK 38 [69 P.3d 266, 273], the plaintiff owned property adjoining a county road in Oklahoma.

---

[3] Although there is a tendency to think of agricultural lands as remote and sparsely populated, that was not always the case even in 1907, and it is certainly not the case today. The right-of-way in *Colegrove*, which was given a broad interpretation, ran through a lemon orchard. (*Colegrove, supra,* 151 Cal. at p. 427.) Because the orchard was located in rapidly developing Hollywood, however, the court applied the right-of-way scope that it deemed appropriate for developed areas. Solano County, bisected by the heavily traveled Interstate 80 corridor between San Francisco and Sacramento, is no more than 45 miles from either of these large urban areas. In 2003, the county itself contained three cities each with a population of over 90,000, and a total county population of over 400,000. (County Administrator's Office, County of Solano, Solano County: 2003 Facts & Figures (2003) p. 4.)

The defendant, a telecommunications company, sought to lay fiber-optic cable in the right-of-way alongside the county road. As here, the landowner contended that the installation constituted a trespassing, requiring his consent. The Oklahoma Supreme Court rejected this contention, holding that " '. . . [t]he new or different use of the highway, or new or different method of transmission or transportation, is but a further proper use of the highways . . . . [¶] . . . As new methods of transportation develop they are used upon the highway whether that use is by bus, truck, or oil pipeline. . . .' " (*Id.* at p. 272, quoting *Nazworthy v. Illinois Oil Co.* (1936) 1936 OK 150 [176 Okla. 37, 54 P.2d 642, 645].) Similar reasoning led the Supreme Court of West Virginia to find the installation of a natural gas pipeline to be within the proper scope of a public right-of-way, noting that "there is no difference whether the question arises in regard to a rural highway right of way or to a city street." (*Herold v. Gas Co.* (1955) 141 W.Va. 182 [90 S.E.2d 451, 456, 458].) Equivalent cases are legion,[4] although other states' courts are not unanimous.[5]

Because the Bellos' property is located in an area with well-developed public infrastructure occupying the public rights-of-way, we find that the trial court erred in applying the standard of *Gurnsey*, rather than that of *Montgomery* and *Colegrove*, to the right-of-way along the Bellos' property. We now proceed to consider whether ABA's pipeline was properly within the scope established by *Montgomery* and *Colegrove*.

## C. *ABA's Status as a Private Company*

■  The Bellos argue that ABA should be denied use of the right-of-way because ABA is a private company rather than a public utility. Although it is true that most prior decisions have addressed the use of rights-of-way by publicly regulated utilities or public agencies,[6] we can find no statutory or doctrinal basis for a per se exclusion of private users from below-ground rights-of-way. On a fundamental level, every member of the public

---

[4] A uniformly broad approach to rights-of-way has been adopted by courts in over a dozen other states. We have discussed the most closely analogous cases in the text.

[5] Despite being adopted in the plurality of states, the broad approach to rural rights-of-way is not universal. (See, e.g., *Cathey v. Arkansas Power & Light Co.* (1936) 193 Ark. 92 [97 S.W.2d 624, 625–626]; *Keokuk Junction Ry. Co. v. IES Industries, Inc.* (Iowa 2000) 618 N.W.2d 352, 362; *Berry v. Southern Pine Elec. P. Assn.* (1954) 222 Miss. 260 [76 So.2d 212, 219]; *Louisiana Power & Light Company v. Dileo* (La.Ct.App. 1955) 79 So.2d 150, 154.)

[6] A notable exception is the seminal *Montgomery* case, which approved use of a public right-of-way for what appears to have been a private railway company without ever mentioning the company's private status. (*Montgomery, supra,* 104 Cal. at p. 187.) Section 862, subdivision 13, of the Municipal Corporations Act of 1883, then in effect, authorized municipalities to permit railway service and lay tracks on public streets. (*Montgomery,* at p. 192; see Stats. 1883, ch. XLIX, § 862, p. 270.)

has an equal right in the use of a public right-of-way. (*In re Anderson, supra*, 130 Cal.App. at pp. 398–399; *People v. Henderson* (1948) 85 Cal.App.2d 653, 657 [194 P.2d 91].) ABA's status as a private corporation no more disqualifies it from access to the underground portion of the right-of-way than it would justify excluding ABA's trucks from using the above-ground right-of-way.

■ Significantly, Streets and Highways Code section 1460, which grants to county governments the right to issue encroachment permits in county rights-of-way, makes no distinction between public agencies or utilities and other proposed users. Indeed, Streets and Highways Code section 1463, which implements section 1460, expressly anticipates that encroachment permits will be granted to private users. It notes that permits "issued to a public agency or a public utility" must contain a particular provision,[7] while "[a]ll permits *other than those* issued to public agencies or a public utility" are subject to a somewhat different rule. (Sts. & Hy. Code, § 1463, italics added.) Consistent with this view, *People v. Sweetser* (1977) 72 Cal.App.3d 278 [140 Cal.Rptr. 82] interpreted section 1450 as granting counties "the statutory authority to issue a written encroachment permit allowing *any person*, including the underlying landowner, to place fences or other structures or objects upon portions of a county highway easement." (*People v. Sweetser*, at p. 284, citing Sts. & Hy. Code, §§ 1450, subds. (a)–(b) & 1460, subd. (b), italics added.)[8]

D. *The Standard for Use of a Public Right-of-way*

■ Although there is no per se ban on private users of a public right-of-way, every encroachment permit should be measured against the standards governing the permissible uses of a public right-of-way. As discussed above, the scope of public rights-of-way has been the subject of a number of prior decisions. Although these cases have not established uniform criteria for evaluating the propriety of a permitted use of a public right-of-way, a synthesis of the examples found in them establishes that a proposed use of a public right-of-way should: (1) serve as a means, or be incident to a means,

---

[7] The exact nature of this provision is not relevant here.

[8] Streets and Highways Code section 1450, which defines terms used in sections 1460 and 1463 (as well as other sections), does contain a somewhat ambiguous sentence applicable only to "works or facilities of any public agency or public utility," but the sentence does not preclude the granting of encroachment permits to private users. Rather, its meaning appears to be best captured in a paraphrase contained in a statutory summary published at the time of its enactment: "Sections 1450–1470 do not apply to works or facilities of any public agency or public utility unless such works or facilities . . . are installed under a franchise." (Review of Selected 1965 Code Legislation (Cont.Ed.Bar 1965) p. 257.) Rather than suggesting a limitation to public agencies and utilities, the statute appears by implication to anticipate permittees other than public agencies and utilities.

for the transport or transmission of people, commodities, waste products or information, or serve public safety (*Montgomery, supra,* 104 Cal. at p. 192; *In re Anderson, supra,* 130 Cal.App. at p. 398; *Mancino v. Santa Clara County Flood etc. Dist., supra,* 272 Cal.App.2d at p. 683); (2) serve either the public interest or a private interest of the underlying landowner that does not interfere with the public's use rights (*People v. Henderson, supra,* 85 Cal.App.2d at p. 656); and (3) not unduly endanger or interfere with use of the abutting property. (*Norris v. State of California ex rel. Dept. Pub. Wks., supra,* 261 Cal.App.2d at p. 47.)

The initial task of determining whether a proposed use of a county road right-of-way satisfies these criteria is vested by statute in the county road commissioner. (See *People v. Henderson, supra,* 85 Cal.App.2d at p. 657.) Streets and Highways Code section 1460 grants to the road commissioner the authority to issue permits for the use of rights-of-way, including the making of any opening or excavation in the right-of-way and the placement of any encroachment. (Sts. & Hy. Code, § 1460, subds. (a) & (b).) The road commissioner's decision will be reversed only if it is found "to have been the result of capricious or arbitrary action or abuse of discretion." (*People v. Henderson,* at p. 657.)[9]

■ We find no abuse of discretion here. The ABA pipeline is used for the transportation of unprocessed natural gas. As a raw material sold for energy production, this is no less a commodity than natural gas transported by public utilities.[10] Although ABA is not a public utility, the installation of ABA's pipeline serves precisely the public interest that rights-of-way were intended to promote: efficient and effective travel and transportation of goods. As testified to at trial, a pipeline is both the most efficient and the safest means of

---

[9] We do not accept the argument of amici curiae League of California Cities and California State Association of Counties that the Streets and Highways Code vests "plenary" authority in the road commissioner in the issuance of encroachment permits. Although Streets and Highways Code section 1460 purports to grant the road commissioner authority to issue a right-of-way permit for "any purpose," *Gurnsey* makes clear that the property rights of the underlying landowner necessarily limit the government's discretion; the road commissioner has no discretion to issue an encroachment permit for a purpose outside the scope of the public's rights in the right-of-way. (*Gurnsey, supra,* 160 Cal. at p. 708.) Available statutory history suggests that section 1460 was not intended to expand the scope of rights-of-way but only to clarify that use of a public right-of-way required issuance of an encroachment permit. (Review of Selected 1965 Code Legislation (Cont.Ed.Bar 1965) pp. 256–257.)

[10] We fail to understand the Bellos' argument that natural gas cannot be considered a commodity until it has been processed for home use. "Commodity" is defined broadly to mean "[a]n article of trade or commerce," which would plainly include both processed natural gas and unprocessed natural gas produced for sale. (American Heritage Dict. (2d college ed. 1985) p. 298.) ABA's gas is sold much like a traditional agricultural commodity. As noted above, ABA's gas, after traveling though the installed pipeline, is mixed with gas from other producers, and ABA loses physical possession of it. Like corn, wheat or petroleum, ABA's gas is treated as a fungible commercial good.

transport for unprocessed natural gas. Particularly in light of the importance of natural gas to the nation's energy economy, encouraging the domestic production of such gas by providing a means for safe and efficient transport is clearly in the public interest. Moreover, the ABA pipeline is part of the network of natural gas supply maintained by PG&E, a state-regulated public utility. Finally, although the Bellos' counsel raises the issue of natural gas pipeline safety in his brief, at trial the Bellos offered no evidence that the pipeline presented any significant risk of danger or interference with use of their property. There is no basis for finding an abuse of discretion in the issuance of an encroachment permit to ABA.

## E. *The Absence of Express Grant Language*

The Bellos next contend that the ABA permit should have been denied because ABA did not produce a document setting forth the language of the original grant of the right-of-way.[11] Prior to the trial, the parties had stipulated that the county "has a right of way" on the Bellos' property and "maintained and controlled" a road within that right-of-way. Beyond the stipulation, no evidence was offered at trial as to the nature, origin or text, if any, of the grant of the right-of-way. On appeal, the Bellos concede that the right-of-way is for purposes of a public highway.[12]

■ Specific language has never been required in California to establish the scope of a public right-of-way. Roadway rights-of-way have been recognized since the very beginning of California statehood. (*Breed v. Cunningham* (1852) 2 Cal. 361, 368; *Wood v. San Francisco et al.* (1854) 4 Cal. 190, 193.) The public may obtain a right-of-way not only through an affirmative grant—a dedication—by private owners but also through persistent public use of private land, whether or not permissive. (*County of Los Angeles v. Berk* (1980) 26 Cal.3d 201, 213 [161 Cal.Rptr. 742, 605 P.2d 381]; *Hays v. Vanek* (1989) 217 Cal.App.3d 271, 281 [266 Cal.Rptr. 856].) Indeed, when private property abuts an established street or road, a right-of-way is simply presumed without further inquiry. (E.g., *Breed v. Cunningham, supra,* 2 Cal. at p. 368; *Montgomery, supra*, 104 Cal. at p. 188.) Because many rights-of-way have existed for a long period of time, as was apparently the case here, it may be difficult or impossible to locate the original grant language. Moreover, a

---

[11] We can find no evidence that this issue was raised before the trial court, suggesting that it has been waived. (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 688 [11 Cal.Rptr.3d 807]; *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 91, fn. 13 [7 Cal.Rptr.3d 267].) Because ABA does not contend that the issue was waived, however, we address its merits.

[12] In ABA's reply brief, its counsel states that ABA was unable to find the source of the right-of-way because it "was established in the 1800s." In the trial court, the Bellos' counsel stated that the "easement . . . is an 1864 ordinance passed by the County Board of Supervisors," but the Bellos provided no evidence to support that assertion.

prescriptive right-of-way has no express grant language. Yet even when grant language exists, the scope of the right-of-way is often expressed in very summary language, such as " '. . . for public highway purposes' " (e.g., *People v. Sweetser, supra,* 72 Cal.App.3d at p. 282) or the equivalent. (*Norris v. State of California ex rel. Dept. Pub. Wks., supra,* 261 Cal.App.2d at p. 46 [" '. . . State highway right of way . . . .' "]; *People v. Henderson, supra,* 85 Cal.App.2d at p. 654 ["public highway"].) Grants using such summary language and rights-of-way for which no specific grant language exists consistently have been treated as subject to a common law establishing generic rights in a public right-of-way. Only where the right-of-way convey-ance is shown to contain specific language beyond the general reference to a road or highway have courts been guided by the specific language of the grant. (E.g., *Faus v. City of Los Angeles, supra,* 67 Cal.2d at p. 352.) Even in *Faus,* a flexible construction departing from the literal language of the grant was adopted. (*Id.* at pp. 355–357.)

■ There is no dispute that the Bellos' property was subject to a roadway right-of-way. In light of the long tradition of applying a common law of public rights to such rights-of-way, ABA was under no requirement to produce evidence of express grant language in order to take advantage of the public's rights in the right-of-way. In the absence of such language, the right-of-way will be deemed to have the scope established by the common law.

F. *The County Encroachment Permit*

The Bellos also argue that ABA was required to obtain their consent under the terms of the encroachment permit issued by the county. Under the heading "Encroachment Permit Standard Conditions," condition No. 8 states that "[t]he permittee shall be responsible for obtaining all other necessary permits and permissions from affected property owners, public agencies, and others."

■ When construing the language of an administrative agency, we must defer to the interpretation of the agency itself unless that interpretation is "unauthorized or clearly erroneous" (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1107 [1 Cal.Rptr.3d 76]) or unreasonable. (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 249 [242 Cal.Rptr. 37].) Deference is particularly appropriate where, as here, the agency is interpreting its own language, drafted to suit a particular circumstance, rather than language drafted by the Legislature. (Cf. *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] [deference is "situational" when an agency interprets a statute].)

A representative of the county transportation department, testifying at trial with respect to the meaning of condition No. 8 of the encroachment permit, stated that it is not, and never has been, the intent of the county to require encroachment permittees to obtain the consent of underlying landowners before installing an encroachment. Rather, the purpose of condition No. 8 is "to let the permittee understand that this is a permission granted by the County, and there may or may not be other permissions required by other agencies, or other parties." In other words, condition No. 8 was intended to ensure that ABA was aware of its responsibility to obtain the permission of other public agencies or private persons or entities, *if* that permission was legally required. Condition No. 8 was not intended independently to create such a requirement.

Based on the plain language of the permit condition and the agency's role, we find this interpretation reasonable. Condition No. 8 requires a permittee to obtain "all other *necessary* permits and permissions from affected property owners, public agencies, and others." The plain meaning of this language is that a permittee must obtain "permits and permissions" from affected property owners if those permits and permissions are "necessary"—that is, if some independent legal ground exists to make them a requirement. Adopting the Bellos' interpretation would require that the word "necessary" modify only "permits" and not "permissions," but there is no logical basis for separating the two words. Rather, "permits and permissions" are meant to indicate the type of authorization that can be obtained from "affected property owners, public agencies, and others." As such, both terms must be modified jointly by "necessary."

The agency's interpretation is also consistent with its limited function. The transportation department is called upon to issue encroachment permits for projects of varying size, some of which may be overseen by other county, state or federal agencies. The department's function is simply to authorize use of the right-of-way, not to address the concerns these other agencies might have. The cautionary language included in condition No. 8, ensuring that the applicant is aware that the encroachment permit does not necessarily constitute legal permission to proceed, is therefore appropriate. Such clauses appear to be a common feature of county encroachment permits. A similar, if differently worded, condition was contained in the encroachment permit issued in *Salvaty v. Falcon Cable Television* (1985) 165 Cal.App.3d 798, 800 [212 Cal.Rptr. 31] (requiring applicant to obtain from " 'private owners of real property any and all permits, licenses or grants *necessary* for the lawful exercise of the permission granted by any application approved hereunder . . . .' "). In light of these factors, we find no reason to reject the county's interpretation of its own permit language.

■ In summary, we conclude the progressive spread of public services into the countryside that has occurred over the last century requires us to apply to the right-of-way along the Bellos' property the standard announced in *Montgomery, supra,* 104 Cal. 186, rather than that of *Gurnsey, supra,* 160 Cal. 699. As noted above, in *Montgomery* the Supreme Court explained that " '[t]he establishment of a public highway practically divests the owner of a fee to the land upon which it is laid out of the entire present beneficial interest of a private nature which he has therein. It leaves him nothing but the possibility of a reinvestment of his former interest in case the highway should be discontinued as such. . . .' " (*Montgomery,* at p. 193, quoting *Paquet v. Mt. Tabor St. R'y Co., supra,* 22 P. 906, 907.) Because the county acted within its discretion in concluding that use of the right-of-way for routing this particular natural gas pipeline was in the public interest and would not unduly harm the underlying landowners, we affirm the county's grant of a right-of-way encroachment permit.

## III. DISPOSITION

The trial court's entry of judgment in favor of the Bellos is reversed. Because the Bellos are no longer prevailing parties, the issues in their cross-appeal are moot. The cross-appeal is accordingly dismissed.

Marchiano, P. J., and Stein, J., concurred.