Filed 4/27/22  Howard v. City of Alameda CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MORTIMER HOWARD,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>CITY OF ALAMEDA,<br><br>     Defendant and Respondent;<br><br>JERRY A. SCHNEIDER,<br><br>     Real Party in Interest and<br>     Respondent. | A159622<br><br>(Alameda County<br>Super. Ct. No. RG18893937) |

Appellant Mortimer Howard filed a petition for writ of mandate under Code of Civil Procedure section 1085, alleging that the City of Alameda (City) exceeded its authority and abused its discretion when it issued an encroachment permit to his neighbor, Jerry A. Schneider.  The permit allowed Schneider to maintain a wooden fence that is constructed on public space adjacent to the paved sidewalk.  The trial court denied the petition, concluding that the City had the authority to issue the permit and had not abused its discretion in doing so.  Alternatively, the court found that Howard had failed to exhaust his administrative remedies.  We agree that issuing the permit was within the City's discretion and affirm.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   *Background and the First Petition*

Howard owns the property located at 2901 Jackson Street in the City. Schneider, real party in interest, is the owner of the property located at 2860 Jackson Street (Property), which is diagonally across the street from Howard's home.  The Property is a corner lot situated at the intersection of Jackson Street and Mound Street.  A gated wooden fence (Fence) runs along the Property's Mound Street frontage, enclosing Schneider's garden which is visible from the sidewalk.  The Fence borders the paved sidewalk that fronts the Property, encroaching approximately three and a half feet into the 12-foot-wide public right-of-way.   Schneider installed the Fence in 2015, replacing an older fence that had been constructed in the same location. Schneider used a different design that includes a larger and taller gate. Reportedly, the former fence had been in place for at least 25 years, well before Schneider purchased the Property in 2008.

In the summer of 2015, Howard began complaining to the City about the Fence.  Howard told the City that the Fence was constructed on the public right-of-way.  Although he received responses from various City officials, including promises that they would investigate the encroachment, they eventually ceased communicating with him.

Beginning in September 2015, the City's Public Works Department (Department) sent Schneider notices asking him to abate certain objects and vegetation encroaching onto the sidewalk, and threatening to remove all unauthorized items at his expense if no action was taken.  The letter advised

2

Schneider that Alameda Municipal Code (AMC)[1] section 22-21.5 "prohibits any person from placing any object obstructing the free use or passage of streets, ways, or sidewalks." (Italics omitted.) Schneider complied with some of the City's abatement requests, but did not remove the Fence.

Schneider wrote to the City's then-mayor in November 2015 complaining that he was being unfairly targeted by the Department. The mayor later met with two Department employees, reportedly asking "why we were arbitrarily picking on citizens who have planter strips that 'make Alameda Alameda'" and "why we were picking on citizens and responding to complaint requests only versus enforcing all the time." Throughout 2016, Schneider and the City exchanged communications that culminated in the Permit at issue. Specifically, a senior code enforcement officer notified Department officials that the Fence encroached on the public right-of-way, opining that Schneider "would need to either demo/back up his fence to private property or pull an encroachment permit with the liability insurance [and] all via the permit center."

The Department's acting director (Director) advised Schneider to submit a permit application to the City, recommending that he describe the work as "something to the effect of 'requesting encroachment permit for fence and plantings alleged to be interfering with the right of way.'" He further advised that he would make sure the permit application "gets to the right people here." Schneider filed an encroachment permit application.

The Director informed Schneider that he would need to agree to certain conditions before an encroachment permit would issue, including that the permit "will have an indefinite time limit and is revocable by the Public

[1] All further undesignated statutory references are to the Alameda Municipal Code.

3

Works Director at any time." The City's risk management staff initially indicated that Schneider would need to provide a certificate of insurance and other documents to obtain approval. The City then prepared a tentative encroachment permit for the Property. Schneider subsequently received an e-mail indicating that the City was ready to move forward with the encroachment permit "without the hold harmless/indemnity provisions," as such provisions had been deemed unnecessary. Schneider paid the permit fee. The City issued Schneider the final version of his encroachment permit on November 21, 2016. In it, the work description states: "WOOD FENCE AND PLANTINGS IN PUBLIC RIGHT OF WAY. **REVISE TEMP ENCROACHMENT TO TEMP SHORT TERM ENCROACHMENT PERMIT W/ NO EXPIRATION DATE." The Permit incorporates a letter from the Director, identifying the following conditions that are attached to the encroachment permit:

"1. Any alterations to the existing fences facing Mound Street must be submitted to Public Works for its review and approval, and the submission must include a copy of this encroachment permit and these conditions.

"2. All shrubs and/or plant material on the street side of your sidewalk must be no higher than 3.5 feet and fully contained within—and not spilling over—the edge of the curb facing the sidewalk and the edge of the sidewalk facing the curb.

"3. On the Mound Street side, you will maintain two clearings free of plantings or other obstructions in order to provide access to the sidewalk for a parked vehicle's passenger. The concrete area that connects the curb and sidewalk counts as one clearing. The other clearing will be at least three feet wide." The letter further states, "The permit will have an indefinite time

4

limit and is revocable by the Public Works Director at any time." On November 30, 2016, the City e-mailed Howard's counsel a copy of the Permit.

In the meantime, Howard had grown increasingly frustrated with the City's lack of communication and hired an attorney who wrote to the city attorney, city manager, and the senior code enforcement officer threatening to obtain a writ of mandamus to compel enforcement of the sidewalk ordinance. In September 2016, Howard filed a petition for writ of mandate seeking an order compelling the City to take enforcement action against Schneider. In February 2017, Schneider demurred to the petition and the City filed a motion for judgment on the pleadings. Concluding that the issuance of the Permit had mooted this petition, Howard dismissed it without prejudice.

## B.    *The Underlying Petition Is Filed*

In February 2018, Howard filed the underlying petition for writ of mandate against former city manager Jill Keimach and others, challenging the City's issuance of the Permit. In his trial brief, Howard argued that the Permit was void because the City had lacked the authority to issue it. Alternatively, he asserted that the City had abused its discretion in granting the Permit. In response, the City contended that it had the authority under the AMC to grant the Permit, and that the permitting decision fell within its police power. Although the City agreed with Howard that "the Permit [was] largely without precedent," it asserted this factor did not "render [the Permit] unlawful or otherwise improper." The City also argued that Howard's

5

challenge was barred due to his failure to appeal the Permit's issuance to the City Council per section 22-21.5, subdivision (b).[2]

On December 16, 2019, the trial court issued its order denying Howard's petition. The court found that the AMC authorized the City to grant the Permit and that the City had exercised its authority consistent with state law. The court also concluded that the City did not abuse its discretion in issuing the Permit. As a separate and independent ground for denying the petition, the court found that Howard had failed to exhaust his administrative remedies. Judgment was entered in favor of Schneider and the City. This appeal followed.

## II.

## DISCUSSION

### A.     *Failure to Exhaust Administrative Remedies*

We first address the trial court's conclusion that the action is barred because Howard did not exhaust his administrative remedies by appealing the Permit's issuance to the City Council. Howard contends the conclusion is flawed because the duty to exhaust administrative remedies was never triggered as section 22-21.5, subdivision (b)'s appeal provision logically applies to permit applicants only. Alternatively, he asserts the administrative remedy is inadequate, and argues that this case falls within the "public interest" exception to the exhaustion requirement. This last contention is persuasive.

Where a petitioner seeks a writ of mandate under Code of Civil Procedure section 1085, " ' "[i]f an administrative remedy is available and has

---

[2] Section 22-21.5, subdivision (b) provides that encroachment permit decisions "may be appealed to the City Council by submitting a letter to the City Clerk within ten (10) days of the decision."

6

not yet been exhausted, an adequate remedy exists and the petitioner is not entitled to extraordinary relief." ' " (*Pich v. Lightbourne* (2013) 221 Cal.App.4th 480, 491.) " 'The exhaustion doctrine "is . . . a fundamental rule of procedure" [citation] under which "relief must be sought from the administrative body and this remedy exhausted before the courts will act." ' " (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 620; accord, *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321.) " ' " 'The basic purpose for the exhaustion doctrine is to lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief.' " ' " (*Action Apartment Assn. v. Santa Monica Rent Control Bd.* (2001) 94 Cal.App.4th 587, 611.)

The facts here are undisputed because Howard acknowledges he did not appeal the permitting decision to the City Council. "We therefore apply the de novo standard of review and give no deference to the trial court's ruling." (*Wallich's Ranch Co. v. Kern County Citrus Pest Control Dist.* (2001) 87 Cal.App.4th 878, 883; see also *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873 ["We apply a de novo standard of review to the legal question of whether the doctrine of exhaustion of administrative remedies applies in a given case."].)

Howard asserts he is excused from compliance with the exhaustion doctrine under the public interest exception set forth in *Environmental Law Fund, Inc. v. Town of Corte Madera* (1975) 49 Cal.App.3d 105 (*Corte Madera*). Under that exception, "the failure of a private person to exhaust an administrative remedy, against governmental action taken in an administrative proceeding to which he was not a party, does not bar him from

7

seeking judicial relief from such action by way of enforcing rights which he holds as a member of the affected public." (*Id.* at p. 114.)

In *Corte Madera*, the appellate court found that public interest petitioners were not barred from judicial relief under the exhaustion doctrine when they had not participated in, nor received any notice of, the relevant administrative proceedings. (*Corte Madera, supra,* 49 Cal.App.3d at pp. 113–114.) That case concerned a challenge to a conditional use permit issued for a planned unit development. (*Id.* at p. 110.) The relevant appeal provision provided that, " '[w]ithin ten days following the date of a decision of the planning commission . . . , the decision may be appealed to the town council by the applicant *or by any other interested party*.' " (*Id.* at p. 111, italics added by *Corte Madera*.) The appellate court concluded that the petitioners were not barred from seeking judicial relief because they had neither appeared at any hearing concerning the permit, nor had notice of the proceedings. Thus, the petitioners were not "interested parties."[3] (*Corte Madera*, at pp. 113–114.) Additionally, the action did not concern the petitioners' personal interests because they purported to assert their claims on behalf of the public generally. (See *id.* at p. 114.)

Similarly, in this case Howard did not have notice of the administrative proceedings leading up to the granting of the Permit. Indeed, no member of the public received such notice because the decision to grant the Permit was not made in the context of a public proceeding. And Howard did not receive

---

[3] Subsequent cases considering the "public interest" exception of *Corte Madera* have uniformly limited its application to situations where the party seeking judicial relief from administrative action had no notice of the administrative proceeding. (See, e.g., *Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 418; *Redevelopment Agency v. Superior Court* (1991) 228 Cal.App.3d 1487, 1498; *California Aviation Council v. County of Amador* (1988) 200 Cal.App.3d 337, 342–343.)

timely notice after the Permit was issued, as the City's counsel sent his attorney a copy of the Permit the day before the 10-day appeal period expired. More importantly, neither the City's counsel's e-mail nor the attached copy of the Permit contained any information about the right to an administrative appeal. And like the *Corte Madera* petitioners, Howard alleges he is asserting his claims on behalf of the general public. Under these circumstances, we agree that the exhaustion requirement is excused under the *Corte Madera* public interest exception and turn to the merits of Howard's petition.

## B.      *Howard Is Not Entitled to Mandamus Relief*

### 1.      **Applicable Legal Principles**

A writ of mandate will lie to "compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station" (Code Civ. Proc., § 1085, subd. (a)), "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law" (*id.*, § 1086). To be entitled to relief, the petitioner must show "a clear, present and ministerial duty" on the part of the public official and "a clear, present and beneficial right to performance of that duty." (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916.) " 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.' " (*Ibid.*) The existence of a ministerial duty is a question of statutory interpretation that we review independently when, as here, it does not turn on disputed facts. (*Ibid.*; accord, *National Asian American Coalition v. Newsom* (2019) 33 Cal.App.5th 993, 1007–1008.)

9

Mandate usually does not lie to compel a public agency to exercise its discretion in a particular manner. "However, it will lie to correct abuses of discretion. [Citation.] In determining whether a public agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.] A court must ask whether the public agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the agency failed to follow the procedure and give the notices the law requires." (*County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 654.)

### 2. The City's Charter and the AMC Do Not Create a Ministerial Duty to Abate Public Encroachments

Howard asserts that because the Fence was "indisputably an illegal 'public nuisance' under the AMC," City officials were required to pursue its removal upon learning that it was encroaching on the public right-of-way. We disagree. The AMC provisions that Howard relies on do not impose a mandatory duty to abate encroachments like the Fence.

Section 23-8.2 defines "encroachment" as "any solid material, or structure, to include without limitation, any human directed alteration of the land and the planting, cultivation or maintenance of any vegetation, located on public property without an encroachment permit." Under section 23-8.3, encroachments "shall be deemed illegal and are hereby declared to be a public nuisance." Under section 23-8.5 the Department's director "shall notify the owner of the abutting private property of his/her responsibility to immediately remove the encroachment and to repair any damage resulting therefrom to the satisfaction of the public works director." Howard argues that "[g]iven the mandatory nature of [section] 23-8.5," the Director was

10

required to pursue abatement of the Fence as a public nuisance "so that the commandeered land could be returned to public use and control."

Discerning the nature of the City's duties under the AMC is a matter of statutory construction. When interpreting a statute we must "determine and give effect to the intent of the enacting legislative body." (*People v. Braxton* (2004) 34 Cal.4th 798, 810.) To do this, " '[w]e first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818.) Also, "the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 505.)

If the statute is susceptible to more than one interpretation, we "may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003.) Additionally, it is well established that a city's interpretation of its municipal code is entitled to respect unless that interpretation is clearly erroneous. (*Horwitz v. City of Los Angeles* (2004) 124 Cal.App.4th 1344, 1354.) Finally, " ' "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the [legislative body] did not intend." ' " (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276.)

11

We reiterate that to be enforceable by writ of mandate a statutory duty must " 'be *obligatory,* rather than merely discretionary or permissive, in its directions to the public entity; it must *require,* rather than merely authorize or permit, that a particular action be taken or not taken. [Citation.] It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function if the function itself involves the exercise of discretion.' " (*Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 633.) As we will explain, while the City has the authority to prosecute encroachment violations, it does not have an unqualified mandatory duty to do so. Nor is the City forbidden from crafting a legislatively approved permit scheme.

In arguing that the City was compelled to abate the Fence under section 23-8.5, Howard observes that under article I, section 1-2(D) of the City charter, the City "shall have and exercise" the right to "enforce all laws." He also notes that section 7-2(B) of the City Charter states that the City manager "shall have the power and it shall be his or her duty" "[t]o enforce all laws and ordinances," and under article VIII, section 8-2 of the City charter, the city attorney "shall prosecute all violations of the ordinances of the City."

Although section 1-3.1 defines the term "shall" as "mandatory" for purposes of construing the AMC, the use of the word "shall" in a statute does not necessarily bar the exercise of discretion. (See *County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 639.) As the Supreme Court has observed, "this term's inclusion in an enactment does not necessarily create a mandatory duty; there may be 'other factors [that] indicate that apparent obligatory language was not intended to foreclose a governmental entity's or

12

officer's exercise of discretion.' " (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 899.)  Such is the case here.

Significantly, Howard fails to fully quote the pertinent passage from section 23-8.3.  In full, that passage reads:  "Encroachments constructed, placed, maintained or otherwise located on public property without an encroachment permit shall be deemed illegal and are hereby declared to be a public nuisance *and **may** be abated in conformance with the provisions of this section.*"  (§ 23/8.3, italics and boldface added.)  Thus, on its face, the ordinance gives City officials the discretion to pursue abatement of an "illegal" encroachment.  It does not *mandate* that they do so.

We also note that section 23-8.4 creates an exception to section 23-8.3 for encroachments "that have been constructed, installed *or maintained with the receipt of an encroachment permit* and which are in conformity thereto." (§ 23.8.4, subd. 1, italics added.)  Schneider has obtained a permit to maintain the Fence, and Howard does not allege that the Fence does not conform with the Permit.  The plain language of section 23-8.4 indicates that permitted encroachments—like the Fence—are not considered illegal public nuisances within the meaning of section 23-8.3.

Howard also fails to fully quote section 23-8.5 in his brief.  That section applies only to unpermitted encroachments and gives the City the power, but not the duty, to remove them.  Section 23-8.5 states, in full:  "Upon the discovery of any unpermitted encroachment located on public property, the public works director or his or her designee shall notify the owner of the abutting private property of his/her responsibility to immediately remove the encroachment and to repair any damage resulting therefrom to the satisfaction of the public works director.  If there is no response by the owner or owners within thirty (30) days of notification, the City *will have the right*

13

to remove the illegal encroachment at the owner's expense." (Italics added.) In sum, the provisions that Howard relies on do not impose an unqualified mandatory duty to abate even illegal, unpermitted encroachments.

And Howard's interpretation of section 23-8.5 would conflict with other AMC provisions. For example, section 22-21.5 subdivision (a) also addresses encroachments, and provides, in relevant part: "No person shall place or cause to be placed anywhere upon any public street, way or sidewalk in the City, and no person owning, occupying, or having control of any premises shall suffer to remain in front thereof upon the sidewalk, or portion of the street or way next to such premises, any boxes, bales, barrels, wood, lumber, goods, wares and merchandise, *or any other thing obstructing the free use or passage* of such street, way or sidewalk." (Italics added.)[4] However, section 22-21.5, subdivision (b) provides that the prohibition contained in subdivision (a) "shall not apply to any obstruction or encroachment upon issuance of a revocable encroachment permit by the Superintendent of Streets."[5] Howard's reading of section 23-8.5 would effectively abolish the City's discretion to issue permits under section 22-21.5, subdivision (b) for any preexisting sidewalk encroachments.

In sum, while the relevant provisions of the AMC clearly authorize the City to take enforcement actions to abate encroachments that are placed within the public right-of-way, these provisions do not create a ministerial duty.

---

[4] In his reply brief, Howard asserts for the first time that section 22-21.5, subdivision (a) cannot be read to apply to stationary, non-temporary improvements such as wooded fences. Simply put, we are not persuaded.

[5] Here, the Permit was issued by the Department's director, who is the supervisor of the City's Superintendent of Streets. (§ 2-30.1, subd. (c).)

14

### 3. The City Retains Prosecutorial Discretion

Even if the AMC provisions discussed above could be read in the manner Howard suggests, mandamus would still be inappropriate. In pursuing enforcement actions under the encroachment ordinance, City officers are carrying out a prosecutorial function that requires the exercise of discretion that a court cannot control absent serious abuse.

"A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) The power includes the authority to enact comprehensive land use and zoning laws. (*Euclid v. Ambler Co.* (1926) 272 U.S. 365, 394–397.) A court cannot command a city to enact specific regulations or direct a city to exercise its enforcement discretion because such a directive would violate separation of powers principles. (*City Council v. Superior Court* (1960) 179 Cal.App.2d 389, 394–395; see also *Nickerson v. San Bernardino* (1918) 179 Cal. 518, 522–523.) It is only when a city enforces its regulations in a manner prohibited by law that a court may "interfere and enjoin" the enforcement. (*Muchenberger v. City of Santa Monica* (1929) 206 Cal. 635, 646.)

For example, in *Blankenship v. Michalski* (1957) 155 Cal.App.2d 672, the petitioner sought a court order to compel the city attorney to begin abatement proceedings against a pharmacy that was allegedly violating a local zoning ordinance. (*Id.* at pp. 672–674.) The trial court ruled that the pharmacy did not violate the ordinance and denied the petition for a writ of mandamus. (*Id.* at p. 674.) On appeal, the appellate court concluded that the relevant ordinance was subject to discretionary interpretation and therefore not amenable to mandamus: "Certainly, someone, in the first instance, must determine whether a proposed use will violate the ordinance. This requires

15

an analysis of the facts and an interpretation of the ordinance. The responsibility of determining this question, in the first instance, is placed on the city attorney. He necessarily must have some discretion. Certainly, if he, in good faith, determines that no violation has occurred, he should not be compelled to institute abatement proceedings at the whim or caprice of every taxpayer who disagrees with him." (*Id*. at p. 675.) That court qualified its conclusion by noting, "It may be that where the claimed violation is clear and obvious the determination by the city attorney that no violation had occurred, and his refusal to bring an abatement proceeding, would be such a clear abuse of discretion that mandamus would issue." (*Id*. at pp. 675–676.)

More recently, in *Riggs v. City of Oxnard* (1984) 154 Cal.App.3d 526, the petitioner sought to require the City of Oxnard to issue a criminal citation and injunction against a competing business that had purportedly violated the city's zoning ordinance. (*Id*. at p. 528.) The trial court denied writ relief. (*Id*. at p. 529.) The appellate court upheld the denial because the petitioner had not sought enforcement of the zoning ordinance, but rather sought penalties of a specific, discretionary nature. (*Id*. at p. 530.) The appellate court reasoned that courts cannot control how public officials choose to exercise their authority: "[I]t is not the function of the court to challenge the municipality's policy and wisdom. 'The function of the courts is to determine whether or not the municipal bodies acted within the limits of their power and discretion.' " (*Ibid*.)

The opinion in *Taliaferro v. Locke* (1960) 182 Cal.App.2d 752 is also instructive. In *Taliaferro*, the petitioner alleged that certain property owners had created a public nuisance by their continued accumulation of garbage, creating an offensive condition that also constituted a fire hazard that violated fire and health ordinances. (*Id*. at p. 754.) He complained that these

16

facts "had been called to the attention of the district attorney but he failed to perform his duty and refused to prosecute." (*Ibid*.) The appellate court addressed the issue of whether mandamus would lie "to compel a district attorney to prosecute every charge of crime that may be made by individuals desiring the prosecution of third persons." (*Id*. at p. 755.) The court answered in the negative, explaining: "As concerns the enforcement of the criminal law the office of district attorney is charged with grave responsibilities to the public. These responsibilities demand integrity, zeal and conscientious effort in the administration of justice under the criminal law. However, both as to investigation and prosecution that effort is subject to the budgetary control of boards of supervisors or other legislative bodies controlling the number of deputies, investigators and other employees. Nothing could be more demoralizing to that effort or to efficient administration of the criminal law in our system of justice than requiring a district attorney's office to dissipate its effort on personal grievance, fanciful charges and idle prosecution." (*Id*. at pp. 755–756.)

Courts may override prosecutorial discretion only where a statute mandates action without regard to the prosecuting authority's own opinion or judgment. For example, in *Board of Supervisors v. Simpson* (1951) 36 Cal.2d 671 (*Simpson*), the Board of Supervisors of Los Angeles County sought a writ to compel the district attorney to institute proceedings for abatement of a public nuisance under the Red Light Abatement Act (Stats. 1913, ch. 17, § 2, p. 20). The statute not only outlawed certain types of public nuisances, but specifically provided that the district attorney " '*must* bring such action whenever directed by the board of supervisors of such county.' " (*Simpson*, at p. 673, italics added by *Simpson*.) The court recognized that while "[o]rdinarily a district attorney cannot be compelled by mandamus to

17

prosecute a criminal case," it nonetheless issued the writ because "here the mandatory duty to prosecute is imposed upon [the district attorney] and the statute leaves him no discretion to exercise." (*Id.* at p. 676.)

Similarly, in *Bradley v. Lacy* (1997) 53 Cal.App.4th 883 (*Bradley*), the appellate court considered a statute providing that after a grand jury has found an accusation, " '[t]he district attorney shall have a copy of the accusation served upon the defendant, and by notice in writing shall require the accused to appear before the superior court of the county, at a time stated in the notice, and answer the accusation.' " (*Id.* at p. 886.) The court addressed whether this statute "imposes mandatory duties on the district attorney or whether, instead, the district attorney has discretion to refuse to comply and thereby effectively abort the prosecution of an accusation found by the grand jury against a public officer." (*Id.* at p. 887.) The appellate court concluded that the statutory language imposed a mandatory, not discretionary, duty that compelled prosecuting the grand jury's accusation, and was thus the proper subject of a writ of mandate. (*Ibid.*)

The situation here is unlike *Simpson* or *Bradley*. As discussed above, the AMC does not create a mandatory duty to prosecute encroachment violations, and Howard does not allege that any public authority has commanded the Director to undertake an enforcement action against Schneider. Accordingly, this is not an appropriate case for judicial intervention.

### 4. The City Had the Authority to Grant the Permit

Howard does not contend that the City lacked the authority to enact section 22-21.5, subdivision (b). Nor does he contest the City's right to issue revocable encroachment permits for temporary obstructions. Nevertheless, he asserts that the City did not have the authority to issue the Permit

18

without an expiration date, which he alleges puts the Permit in conflict with at least two other ordinances, sections 5-16.11 and 22-6.1. We disagree.

Section 5-16.11 provides, in relevant part: "Any permit granted pursuant to the provisions of this Code or other City ordinance, but under which the thing therein permitted has not been done, carried on or maintained within a period of six (6) months from the time of issuance of such permit, shall expire by limitation and cease to be valid for any purpose." Howard asserts that the Permit did not require Schneider "to do *anything* within six months of its issuance," and therefore it "should have expired after a maximum of six months." The argument lacks merit. Construed in context, a plain reading of this section is that permittees have six months within which to undertake the permitted activity. Here, the fence was the "thing therein permitted" and it was "maintained" at the inception of the Permit, since it was already existing. The six-month deadline has no application under these circumstances.

Moreover, section 5-16.1 provides that its permit requirements govern "unless otherwise specifically provided." The City had the authority to grant the encroachment permit to Schneider under section 22-21.5, subdivision (b), which provides, in relevant part:

> "The provisions of paragraph a. shall not apply to any obstruction or encroachment upon issuance of a revocable encroachment permit by the Superintendent of Streets. The Superintendent of Streets may grant the encroachment permit taking into consideration the utilities underground and the safety, planning requirements, and needs of the City. Before issuing an encroachment permit the Superintendent of Streets shall find that the permit will not substantially interfere with the public health, safety or welfare. In granting the permit the Superintendent of Streets may attach such terms and conditions as he/she deems necessary to carry out the intent of this paragraph."

19

As is evident, section 22-21.5, subdivision (b) requires encroachment permits to be "revocable." It does not require them to have a specific expiration date. In sum, section 5-16.1 does not apply to our facts.

Howard also asserts that because the Permit does not have an expiration date, it violates section 22-6.1, which states: "No person shall place or cause to be placed on any street, sidewalk or public place in the City, any material, machinery or apparatus for building, paving or other purposes and allow the same to there remain for over twenty-four (24) hours without a permit from the Street Superintendent. Such permit shall specify the portion of the street or sidewalk to be used and the period of such use, which period shall not be longer than may be reasonably necessary and may be extended only in case of necessity."

This provision patently does not apply to existing structures like the Fence at issue here. The term "material" is qualified as material "for building, paving or other purposes." This term would not appear to include a property's boundary fence. Moreover, section 22-6.2 makes it clear that the 24-hour time limitation is intended to apply to material used in construction projects, as it requires the permittee to guarantee that he or she will "remove or cause to be removed all dirt, debris and material of any kind from the street to the satisfaction of the Street Superintendent, immediately upon the completion of the proposed work, or at such times prior thereto . . . ."

Howard also cites to section 1-3.1, which provides: "Where any provision of this Code imposes greater restriction upon the subject matter than any general provision imposed by this Code, the provisions imposing the greater restriction or regulation shall be applicable." He then quotes section 30-5.14, which provides that barriers, including fences, may be built within the property boundaries. Howard asserts that permitting fences in

20

the public right-of-way would violate section 1-3.1 by allowing a less restrictive ordinance to control over a more restrictive one.

Contrary to these contentions, however, section 30-5.14 does not provide that a fence "may **only** be built *within the property boundaries*." The provision actually states: "Barriers, as defined herein, may be construed [*sic*] in all land use districts within the property boundaries of the individual lots according to the definitions, standards, and provisions of this subsection." (§ 30-5.14.) While this provision does provide that fences may be constructed within a property's boundaries, it does not expressly prohibit the City from issuing permits for fences that encroach on public land.

### 5. The Permit Did Not Violate State Law

Howard further contends that state law prohibits the City from issuing permits that authorize private encroachments onto the public right-of-way. The trial court dispensed with this argument, finding that Howard had failed to identify any authority that would prohibit the City from issuing an encroachment permit for a fence or similar structure within the public right-of-way "where it is located in a manner that does not interfere with the public health, safety, or welfare." On appeal, Howard maintains that he *did* cite to cases addressing a city's power to authorize private sidewalk encroachments. We need not delve into this argument, however, as the cases that he relies on are from Missouri, and therefore not binding on California courts. (*People v. Troyer* (2011) 51 Cal.4th 599, 610 [out-of-state cases not binding on California courts].)

Howard further complains that issuing the permit was inconsistent with state law. He relies largely on *County of El Dorado v. Al Tahoe Investment Co.* (1959) 175 Cal.App.2d 407 (*El Dorado*) and *People v.*

21

*Henderson* (1948) 85 Cal.App.2d 653 (*Henderson*). The cases do not aid his cause.

In *El Dorado,* a service station owner expanded his facility by placing a pump island within the right-of-way of a county highway that ran in front of the service station. (*El Dorado*, *supra*, 175 Cal.App.2d at p. 409.) The county granted the owner an encroachment permit for the pump island. The permit was silent as to its revocability. (*Ibid*.) Thereafter, the county revoked the permit and successfully pursued an abatement action against the owner to remove the pump island. (*Ibid*.) The statutory enforcement scheme defined " 'encroachment' " to include "any structure or object of any kind or character placed, without the authority of law, either in, under or over any county highway." (Sts. & Hy. Code, § 1480, subd. (b).)

In addressing the owner's argument on appeal that constructing the pump island was authorized under the prior encroachment permit, the *El Dorado* court observed that the pump island "was not a temporary obstruction, and except where the use is temporary a subordinate legislative body would have no power to permit a private owner to use the street for business purposes." (*El Dorado*, *supra*, 175 Cal.App.2d at p. 410.) The appellate court endorsed the lower court's conclusion that " 'a board of supervisors does not have power to authorize the use of roads or streets for private purposes, except where the use is temporary.' " (*Ibid*.)

Howard asserts that the Fence, like the pump island in *El Dorado,* was not "temporary," and that the City therefore had no power to grant the Permit. Significantly, however, *El Dorado* is distinguishable in that it did not concern a sidewalk. As the trial court here observed, "roads and streets serve very different functions than sidewalks, and municipal authorities traditionally retain much greater control over sidewalks under California

22

law." In support, the court cited to a 1993 Attorney General opinion, 76 Ops.Cal.Atty.Gen. 31 (1993) (hereafter 1993 opinion). The court also concluded that a municipality may issue even a non-temporary encroachment permit "so long as it has legislative authorization." We agree with the trial court that *El Dorado* does not control here.

The 1993 Attorney General opinion referenced by the trial court responded to the following inquiry: "May a city authorize its residents to install basketball standards in the public right-of-way between the sidewalks and street curbs of residential neighborhoods so that the backboards face the streets and extend beyond the curbs?" (1993 opinion, 76 Ops.Cal.Atty.Gen., *supra*, at p. 31.) The Attorney General concluded the city could authorize this use, "provided that the safety and convenience of the traveling public are protected." (*Id.* at p. 32.) Citing to a string of cases, including *Henderson*, and another case that Howard relies on (*City of Berkeley v. Gordon* (1968) 264 Cal.App.2d 461, 464–467), the Attorney General observed: "A city may control the public right-of-way by reasonably regulating the installation of obstructions consistent with the right to travel." (1993 opinion, at p. 37.) The opinion supports the view that the City acted within its police power in issuing the Permit.

Howard's reliance on *Henderson* is also misplaced. In *Henderson*, the appellants had constructed a 20-by-30-foot temporary shed on a public highway easement located on their property. The shed consisted of a galvanized iron roof on six or eight two-by-four-foot upright posts, with no side walls. (*Henderson, supra*, 85 Cal.App.2d at pp. 654–655.) The state sued, and the trial court enjoined the appellants from placing any encroachments on the easement. (*Id.* at p. 655.) On appeal, the appellants claimed that they had the right to use the easement for any purpose that did

23

not interfere with the public use of the right-of-way.  They argued that the shed was inoffensive because it was located 15 feet from the established highway, was on a portion of the land that was not used by others, and did not interfere with the vision of highway users.  (*Id.* at pp. 655–656.)  The state countered that its Department of Public Works had exclusive right to regulate the easement.  (*Ibid.*)

In ruling against the appellants, the *Henderson* court cited to provisions of the Streets and Highways Code in concluding that the state Department of Public Works possessed "the power to determine, upon an application for a permit, whether the intended encroachment is one that would be inimical to the full enjoyment of the public rights in the highway and against the public interest."  (*Henderson, supra*, 85 Cal.App.2d at p. 657.)  Far from suggesting that the City has no power to permit non-temporary encroachments, this passage supports the City's position that it had the police power to authorize the Fence through its legislatively created permit system.

Similarly, *Western States etc. v. Bayside L. Co.* (1920) 182 Cal.140, another case cited by Howard, also suggests that a municipality may issue a non-temporary encroachment permit so long as it has legislative authorization.  As Howard acknowledges, the *Western States* court held: " 'Except where the use is temporary *or the power has been delegated by the legislature*, a municipality has no power to authorize the use of streets for a private purpose, that is, one from which neither the municipality nor its citizens derive any consideration or benefit.' "  (*Id.* at p. 144, italics added.)  We also reject Howard's suggestion that *Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1179 diminishes the *Western States* holding.  In referencing *Western States*, the *Zack's* court was evaluating the scope of the

24

statutory immunity afforded by Civil Code section 3482, which states: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." (*Zack's,* at p. 1179.) The *Zack's* court did not establish an analytical framework for evaluating the delegation of authority under a municipal ordinance.

Howard also seizes upon the *Henderson* court's uncontroversial observation that the state would have acted reasonably had it authorized the temporary use of a portion of the right-of-way for the shed, but that "a general policy of permitting structures and obstructions of various types to be maintained upon public rights of way" would be "in clear violation of the rights and interests of the public." (*Henderson*, *supra*, 85 Cal.App.2d at p. 658.) Howard concludes the Permit was "a clear violation of the rights and interests of the public." He overlooks that the *Henderson* court left the right to make such assessments to the relevant public agency, *not* the courts: "A line must be drawn between those encroachments that would, and those that would not, infringe upon the rights and be adverse to the interests of the public, and that line *must necessarily* be drawn by the Department of Public Works in the proper exercise of its discretion." (*Id.* at pp. 658–659, italics added.)

Finally, Howard argues that the Permit fails to comport with the test we articulated in *Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301 (*Bello*) for encroachment permits involving public utilities. *Bello* is readily distinguishable.

In *Bello*, rural property owners had sued an energy company for trespass, claiming that the company, which installed a natural gas pipeline in a public right-of-way easement located on the owners' land, was required to obtain their consent before laying a natural gas pipe in the right-of-way.

25

(*Bello*, *supra*, 121 Cal.App.4th at p. 306.) Although the company had obtained an encroachment permit from the county to install the pipeline, it had not provided notice to the owners or sought their approval. (*Id.* at p. 305.) In finding that the trial court had erred in concluding that the energy company had committed a trespass against the property owners, we set forth the following standards for assessing the propriety of granting of an encroachment permit in this context: "[A] proposed use of a public right-of-way should: (1) serve as a means, or be incident to a means, for the transport or transmission of people, commodities, waste products or information, or serve public safety [citations]; (2) serve either the public interest or a private interest of the underlying landowner that does not interfere with the public's use rights [citation]; and (3) not unduly endanger or interfere with use of the abutting property." (*Id.* at pp. 315–316.)

The *Bello* test has no application here. *Bello* concerned public right-of-way easements that are situated on privately owned land within the meaning of Civil Code section 801, subdivision (4), which provides: "The following land burdens, or servitudes upon land, may be attached to other land as incidents or appurtenances, and are then called easements: [¶] . . . [¶] . . . The right-of-way." (See *Bello*, *supra*, 121 Cal.App.4th at p. 308.) In contrast, the Fence is not located on an easement. Thus the test articulated in *Bello* does not apply.

**6.      The Director Properly Evaluated the Permit Application**

Finally, Howard asserts that the Permit was improperly issued. He claims the City produced no evidence that the Director took into consideration the "safety, planning requirements, and needs of the City," under section 22-21.5, subdivision (b), before issuing the Permit. He acknowledges, however, that the Director confirmed that there had been a

fence in the same location for many years, and that the Fence did not encroach on the paved part of the sidewalk.

In general, "[i]t is presumed that official duty has been regularly performed." (Evid. Code, § 664; see, e.g., *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 976 ["the relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the board] *failed* to comply with the requirements of its . . . regulatory program" and, "[i]n the absence of contrary evidence, we presume regular performance of official duty"].) As the moving party, it was Howard's burden to set forth evidence demonstrating that the Director abused his discretion in issuing the permit.

Apart from taking umbrage at the fact that the Permit effectively "cedes to a private citizen the exclusive use of a portion of the public right of way indefinitely," Howard does not identify any aspect of the Fence itself that imperils the "safety, planning requirements, and needs of the City." He merely speculates, without presenting any actual supporting evidence, that the section of the sidewalk enclosed by the Fence serves "as a critical area of refuge for pedestrians towards whom wide loads or speeding bicycles or scooters are heading down the paved part of the sidewalk at high speeds."

Should Howard's speculations become realized, we note that the Permit, by its own terms, grants no permanent vested right to the Fence, as the Permit is revocable at any time and for any reason. Further, to the extent Howard claims that the City's decision to not require Schneider to sign an indemnity and hold-harmless agreement amounted to an abuse of discretion, he fails to present any evidence or legal support for this issue. Accordingly, Howard has not demonstrated that the issuance of the Permit constituted an abuse of the Director's discretion.

## III.

## DISPOSITION

The judgment is affirmed.

EAST, J.*

WE CONCUR:


HUMES, P. J.


MARGULIES, J.


A159622
*Howard v. City of Alameda*

---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.